BANGOR BAPTIST CHURCH, Bangor Christian Schools, Grace Baptist Church, Grace Baptist Church Schools, Falls Road Baptist Church, Falls Road Christian School, First United Baptist Church, Lee Christian Schools, Victory Baptist Church, Victory Christian Schools, Sebec Corner Christian Church, Sebec Christian Academy, Church of the Open Bible, Athens Christian Academy, Church of the Blessed Hope of Jesus Christ, New Life Academy, Windham Assembly of God, Windham Assembly Christian Academy, Calvary Foursquare Church, Gardiner Christian Academy, Reverend Herman C. Frankland, Reverend Harry P. Boyle, Reverend John Hatfield, Reverend John Allen, Reverend Glenn Speed, Jr., Reverend Daniel Dunphy, Reverend Gerald Dennis, Esmeralda J. Dennis, Reverend Adra Lovely, Jr., Richard Ryerson, Reverend Isaiah Hill, Chester L. Dana, Jr., Reverend Walter E. Fordyce, Reverend Jeffrey Clark, John D. Linnehan, Jr. and Heather M. Linnehan, Alfred R. Roussel and Lianne M. Roussel, Thomas M. Obey and Mary L. Obey, David Lavway, Bonnie C. Boyington, Eugene St. Clair, Jr., and Maine Association of Christian Schools, Plaintiffs,[1] Defendants in Counterclaim,

v.

STATE OF MAINE, DEPARTMENT OF EDUCATIONAL AND CULTURAL SERVICES, Commissioner of Educa-

---

1. The plaintiffs are: ten independent fundamentalist Christian churches and their affiliated schools and pastors; the chief administrators of four of the plaintiff church schools; four parents whose children attend either Bangor Chris-

tian Schools or the Grace Baptist Church Schools; two parents of pupils attending Ellsworth Christian School, which is a member of plaintiff Maine Association of Christian Schools (MACS); a Bangor Christian Schools teacher and its principal; a Grace Baptist Church Schools teacher; and MACS.

Calvary Foursquare Church and Gardiner Christian Academy appear to have been omitted from the Second Amended Complaint through inadvertence, after having been added as plaintiffs on December 28, 1981. The chief administrator of Gardiner Christian Academy (Reverend Allen) was named as a plaintiff in the

tional and Cultural Services and Members of the Maine State Board of Education, Defendants, Counterclaimants.

Civ. No. 81–0180–B.

United States District Court,
D. Maine.

Dec. 20, 1983.

Second Amended Complaint. After defendants counterclaimed against Gardiner Christian Academy, it responded and Gardiner Christian Academy is treated as a plaintiff in the trial stipulation filed with the Court on January 30, 1983. Accordingly, the pleadings are hereby amended to conform to the evidence, pursuant to Fed.R.Civ.P. 15(b).

Also dropped as a party plaintiff is Reverend William Greenwood, the administrator of Kingfield Christian Academy, which has ceased operations and was dropped as a party, along with its affiliate, First Baptist Church, on January 25, 1983.

William B. Ball, Philip J. Murren, Harrisburg, Pa., Kevin M. Cuddy, Samuel W. Lanham, Jr., Bangor, Me., for plaintiffs, defendants in counterclaim.

Rufus Brown, Deputy Atty. Gen., William R. Stokes, Asst. Atty. Gen., Ellen E. George, Sp. Asst. Atty. Gen., Augusta, Me., for defendants, counterclaimants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CYR, Chief Judge.

The plaintiffs challenge the constitutionality of various Maine statutes and regulations governing compulsory education and the approval of private schools. The counterclaim against the ten church schools and their pastors or administrators demands a judicial declaration that their failure or refusal to provide defendants with school approval information violates Maine law, and permanent injunctive relief requiring plaintiffs to provide the information "as a condition to continued operation of their respective schools with compulsory school age children" during the hours such children would otherwise be attending an approved school. Partial summary judgment has been granted in favor of the defendants.

See *Bangor Baptist Church v. State of Maine*, 549 F.Supp. 1208, 1232 (D.Me.1982).

On the stipulations of the parties and on the exhibits [2] and the testimony received during the eight-day trial the Court makes the findings of fact and conclusions of law contemplated by Fed.R.Civ.P. 52(a).

### I. *History of Present Dispute*

The earliest evidence of the present dispute is a March 24, 1977 letter from the administrator of Bangor Christian Schools (Bangor Christian) requesting the Maine Department of Educational and Cultural Services (Department) to exempt Bangor Christian from a Department regulation requiring private schools to submit a five-year plan for basic approval. Describing Bangor Christian as an integrated auxiliary of the Bangor Baptist Church, the administrator informed the Department that Bangor Christian believed that the regulation requiring the submission of a five-year plan went "beyond the legitimate responsibility of the State to see that each municipality provides suitable education for their [sic] youth." The administrator represented that Bangor Christian, an approved school,[3] had "always adhered to ... governmental control" respecting the maintenance of certain minimal standards "in order to qualify as a safe, healthful, bona fide school," but that it objected to "the increasing involvement of government in the lives of private individuals and private institutions." Expressing concern that the request would "eventually involve" unnecessary and unacceptable state "control [of] religious instruction" and that the "humanistic and secular approach of the public education system" is diametrically opposed to the "integrated, Christian approach" at Bangor Christian, the administrator asked that Bangor Christian be permitted to control its own educational planning and direction.

Plaintiff Maine Association of Christian Schools (MACS) was founded in the spring

2. Plaintiffs' 'Revised List of Exhibits,' as supplemented at trial, contains 98 exhibits. Defendants' 'Final Revised List of Exhibits,' as supplemented at trial, contains 102 exhibits. All exhibits were admitted into evidence, except plaintiffs' Exhibit 38, which was withdrawn, and defendants' Exhibits 89 and 90.

3. *See* note 6 *infra*.

of 1979 to promote and improve Christian school education in Maine and to defend Christian schools against perceived encroachments by state regulation.[4] Plaintiff Herman C. Frankland, the pastor of Bangor Baptist Church, became President of MACS, and Ralph Yarnell became its Executive Director.

On May 15, 1979, MACS called a general meeting of its member schools to discuss the "right position of Christian Schools in Maine" with respect to state approval. Defendants' Exhibit 1. At that meeting MACS members[5] voted to pay $1,200 to have two lawyers and an educator address them the following month and "to give ... counsel with regard to philosophy, strategy etc.," *id.* Meanwhile, MACS members unanimously voted to take no official position regarding state approval. Schools choosing "to buck state approval in the meantime would be doing so without any backing from MACS." *Id.*

On June 8, 1979 John McLario, Esq., a Wisconsin attorney specializing in the representation of Christian schools, addressed the MACS Board of Directors 'and the MACS constituency. On June 23, 1979 Dr.

Paul Cates, an evangelist and former vice president of the American Association of Christian Schools (AACS), addressed the administrators and pastors of all MACS-member schools, as well as many church and church school-board members. On June 29, 1979 the group was addressed by David Gibbs, Esq., of Gibbs & Craze (Cleveland), which specializes in representing religious schools involved in disputes with state regulators. These three individuals informed the MACS administrators and pastors as to the constitutional standards governing state regulation of church schools.

On August 1, 1979 Wallace LaFountain, a consultant to the Department, invited the administrators of all Christian schools in Maine to an August 13, 1979 conference to discuss the certification of Christian-school principals, the approval of Christian-school curricula and the church-school approval process itself. As of August 5, 1979 all Christian schools known to be operating in Maine with compulsory-school-age children in attendance during normal public-school hours had obtained state approval.[6] At

---

4. Prior to the spring of 1979 many of the schools which founded MACS belonged to its regional predecessor, Northeast Region American Association of Christian Schools [NER-AACS], an organization of Christian schools in New England and New York. NERAACS was gradually phased out of existence as its members formed state associations.

5. Thirteen of the 23 Christian school members of MACS in 1979 are no longer members:
   South Hope Christian School
   Clinton Christian School
   Blaisdell Baptist Academy
   Lisbon Falls Christian Academy
   Penobscot Valley Christian Academy
   Tabernacle Christian Academy
   Heritage Christian Academy
   Mid-Coast Christian School
   Hermon Christian School
   Limestone Christian Academy
   Enfield Christian School
   Central Maine Christian School
   Ossippee Valley Christian School.
   The ten schools which have remained MACS members since 1979 are
   Bangor Christian Schools
   Grace Baptist Church Schools
   Wayside Christian School

   Downeast Christian School
   Ellsworth Christian School
   West Sumner Christian School
   Calvary Christian Academy (Turner)
   Kennebec Valley Christian School
   Northwoods Christian School
   Wiscasset Christian Academy.
   Of these, only Bangor Christian and Grace Baptist Church Schools are plaintiffs in this action.
   The following seven schools, the first five of which are plaintiffs, have since joined MACS:
   Falls Road Christian School
   Lee Christian Schools
   Victory Christian Schools
   Sebec Christian Academy
   Athens Christian Academy
   Calvary Hill Christian School
   Hartland Christian School.

6. Bangor Christian, which began operating in 1970, obtained state approval for each of its first eight years of operation and in 1978 received a five-year approval certificate which expired in June, 1983. Until at least 1975 Bangor Christian displayed its certificate of state approval in the school catalogs and expressed pride in having achieved the academic quality evidenced by state approval. *See* Defendants' Exhibit 67. Reverend Frankland testified that the certificate

that time several new Christian schools proposed to operate during the 1979–80 school year without obtaining state approval.

On August 5, 1979 Reverend Frankland notified all MACS-member pastors and administrators of an emergency meeting to be held August 10, 1979 for the purpose of determining the position MACS should take at a meeting scheduled with state officials for August 13.

On August 7, 1979 the MACS Board of Directors drafted a four-point plan for presentation to the Department as an alternative to formal school approval of the eight new Christian schools scheduled to open that fall. The plan called for a one-year moratorium on the state school-approval requirements, during which the new Christian schools would

1. receive the approval of the Department of Public Safety and the Department of Human Services prior to opening;

2. permit Department officials to conduct on-site observation of the schools in operation;

3. teach a "bona fide curriculum" meeting the requirements of Maine law; and

4. employ teachers qualified for state certification.

During the one-year moratorium MACS would seek legislative exemption from the statutory requirement of school approval. Tr. at 66.

On August 8, 1979 Department consultant LaFountain met with MACS representatives to determine their position regarding state approval of church schools. MACS officials informed LaFountain that their church schools were integral parts of their religious ministries and not susceptible, either on constitutional or biblical authority, to state control, because acquiescence to any form of state approval of church-school teachers, principals or curricula would violate their biblically-based religious conviction that Christ, not the state, is sole sovereign in such matters. The MACS representatives announced that the as-yet unapproved church schools would reject state approval because acquiescence to state approval might imply a state right-of-control, and because acquiescence might later be used in court to demonstrate that their professed religious beliefs regarding state control were based on nonreligious preferences, rather than religious conviction. LaFountain was then informed of the MACS four-point plan. *See* Defendants' Exhibit 4.

The factors which influenced plaintiffs to adopt the position taken at the August 8, 1979 meeting included: (1) a January 1978 statement issued by NERAACS, setting forth objections to state approval; (2) an increase in the number of requirements for school approval; (3) the nationwide growth of the teaching program known as Accelerated Christian Education (ACE);[7] (4) a growing awareness that fundamentalist Christians in other states were involved in challenges to similar statutes; (5) a concern that the approval laws were vague; and (6) a maturation of fundamentalist Christian convictions regarding the total sovereignty of Christ over the church and its ministries. Tr. at 20–21, 219–21, 241–43, 504–13.

When the unapproved church schools planning to open in the fall of 1979 expressed their desire to join MACS, but advised that they could not accept state approval, the members of MACS decided to

---

was displayed in order to demonstrate to parents that "we weren't some fly-by-night organization." Tr. at 285.

Grace Baptist Church Schools obtained initial state approval in 1976 and renewed approval in 1977 and 1978.

7. The ACE teaching program, marketed by a Texas-based company, consists of a series of booklets on various subjects, each of which is called a Packet of Accelerated Christian Education (PACE). Each PACE contains Bible-oriented instructional information and self-test questions on a particular subject. Students work at their own speed in each subject. After completing the booklet and passing the self-test and a supervised test, students move on to the next sequentially-numbered PACE until they reach the twelfth level of achievement. The supervisors who administer the tests do not teach regularly, but remain available to maintain discipline and to assist students on request.

stand beside the new church schools in opposition to state approval. Tr. at 221.

On August 13, 1979, 88 Christian educators and pastors attended a conference with Department officials, who expressed satisfaction with the request that Christian school *principals* not be required to obtain state certification.

On August 16, 1979, MACS officials met with the newly-appointed Commissioner of Education, Harold Raynolds (Commissioner), and presented a more detailed version of their four-point plan for dealing with the new unapproved church schools during the 1979–80 school year. *See* Defendants' Exhibit 9. The MACS proposal stated that MACS would (1) act as a catalyst to have new MACS-member schools inspected for health and safety purposes prior to opening; (2) arrange visitations to MACS-member schools by Department officials; (3) assure the Department that each MACS-member school was presenting a bona fide curriculum consistent with state requirements; and (4) assure the Department that each MACS-member school employed teachers who were qualified for state certification. These proposals were intended as an interim substitute for state approval while MACS pursued a legislative resolution of the problem.

Plaintiff Frankland wrote the Associate Commissioner of the Department on August 16, 1979 in response to a request for an explanation of the religious objection to state approval. Reverend Frankland described the church schools as the teaching arms of the Church, integrally connected with it. He characterized state licensure of church schools, their curriculum or their staff as tantamount to licensing the churches, their ministers and the subject matter taught in church, stating that to permit such regulation would be to render unto Caesar that which belongs to God. In order to avoid having their religious conviction regarding state regulation diluted in the eyes of the law to a mere preference, wrote Reverend Frankland, the churches must object to state regulation of their schools.[8]

On August 30, 1979 the Commissioner informed MACS of the Department's position that the minimum standards required of public and private schools "do not impose an onerous burden upon schools which seek approval." The Commissioner described as "reasonable" the regulations requiring minimum hours of instruction, employment of only "qualified instructors" and instruction in prescribed subjects. The Commissioner advised that the Department would—

> carry out its mandate to approve public and non-public schools in accordance with the laws of the State of Maine [and] ... only consider waiving part or all of the minimum standards utilized in the approval process if it can be established that the standards in question violate an individual's constitutionally protected rights and that the State's interest in adhering to those standards is not of sufficient magnitude to override the claimant's rights.

The Commissioner went on to say that "[u]nder no circumstances will the Depart-

---

**8.** Reverend Frankland wrote as follows:

This brings us to the crux of the matter. The United States Constitution and the Maine Constitution guarantees (sic) us certain religious liberties under the First Amendment, if these beliefs and practices are convictions on our part and not preferences. In order for the courts to rule it is a conviction rather than preference, we must be willing to go to jail for, or die for said beliefs.

Some judges and state agencies are asking, 'Why was this not an issue 10 years ago?' Our reply is, 'We were in unchartered waters endeavoring to be good citizens and actually not aware we were rendering unto Caesar that which belongs to God.' After 200 successful court cases across the nation and a refining of our own philosophy, we are forced to act immediately, or we have no guarantees under the First Amendment. In the judge's eyes, these things are not a conviction with us if we continue allowing the State to have jurisdiction in this area, when we know in our heart it is wrong. Therefore, we have several new schools starting this fall which believe this to the point they are willing to go to jail for their convictions, and we who had previously accepted basic approval and state licensure are convinced we must stand with them.

Defendants' Exhibit 8.

ment waive the requirement that all public and non-public schools be approved *in order to be able to operate* as schools in the State of Maine." (*Emphasis added.*)

On September 11, 1979, after meeting with representatives of MACS, the Department issued a press release captioned, "Statement Regarding the Approval of Private Schools," which asserts that the Department "is presently reviewing the curriculum, the educational programs, and the credentials of the teachers of certain private schools which object on constitutional grounds to the formal school approval mandated by law." The press release further stated—

> [i]t is the Department's position that during the school year 1979–80 each of these schools will meet the minimum standards for approval required by law. If the Department is satisfied that the schools have met the minimum standards for approval, then the Department will treat these schools as having been approved for attendance purposes during the school year 1979–80.

Defendants' Exhibit 10. When this press release was issued MACS was informed that the four new schools would "not risk truancy litigation" provided the requirements outlined in the press release were satisfied.

On September 12, 1979, in response to a request from the Department, MACS agreed to submit sanitation information regarding three schools and to update the sanitation and fire safety information relating to a fourth school. MACS agreed to answer all questions on the school approval form as to which there were no constitutional objections.

On September 17, 1979, MACS notified its members of a "sensitive ... meeting" scheduled for September 21, 1979 with Charles Craze, Esq., of Gibbs & Craze.[9] MACS members were advised that they must "decide what their convictions are regarding state approval in advance of the meeting." The letter instructed MACS members to read the enclosed articles regarding religious convictions and state licensure of Christian schools. One article, by Paul Cates, states that its purpose is to enable the reader "to give Biblical explanations. for the stand you take" against state regulation of religious entities. The article emphasizes that in order for beliefs to be constitutionally protected they must be convictions as opposed to preferences.

The second article MACS members were asked to read before the September 21, 1979 meeting described constitutional, educational and scriptural reasons for opposing · state licensure of Christian schools. The article identifies the following risks of state regulation:

1. the state will impose its "child-centered" teaching methodology upon church-school students in contravention of the "subject-centered ... methodology" of the Christian schools;

2. the state will impose a secular humanist philosophy upon the church schools;

3. the state will mandate sex education courses and other programs and approaches offensive to Christian values;

4. the state will ban the types of student discipline required by the Bible; and

5. the state will prescribe textbooks of poor quality.

The scriptural bases for opposing state licensure were stated as follows:

> The responsibility for training a child is first laid on the parents (Pro. 22:6 and Eph. 6:4). Human government is ordained by God to suppress those who work violence and evil in society (Rom. 13:3–4). The mission of the church is clearly to preach and teach. The home, church and state must maintain their proper roles.
>
> . . . .
>
> Christians are certainly commanded to obey laws of their nation (I Pet. 2:13). Advocates of civil disobedience find little

---

9. The notice states that it is late in going out "because MACS has been waiting for the tape and the sample letter from David Gibbs." It goes on to state "that the tape will be made while Charles Craze is here. The letters will be drafted at the same time."

encouragement in scripture. The only scriptural justification for a Christian to disobey his government would be in the case where the law of Caesar conflicts with the law of God. Yet, one might point out that Paul faced jail and punishment by the state in most of his ministry. Again, however, his offence was only preaching and teaching, and he obeyed God rather than Caesar.

At the September 21, 1979 meeting with Attorney Craze, separate letters were drafted in behalf of 19 MACS-member schools [10] for delivery to the Commissioner, each letter advising in substance that after much contemplation the church-school authorities had concluded that their biblical convictions compelled them to reject state regulation of their schools and teachers, which are integral and inseparable parts of the religious ministry of their churches.

On September 28, 1979, Department officials met with MACS representatives and Attorney Gibbs, and the 19 letters were presented to the Commissioner. In anticipation of a legislative resolution of the problem in 1980 the Commissioner assured MACS that the new church schools could continue to operate during the 1979–80 school year without fear of state action.

On October 11, 1979, MACS advised all of its members of the identity of the 19 MACS-member schools which had already submitted letters to the Commissioner, and urged five other MACS-member schools to submit letters.[11]

During November and early December, 1979, six more churches operating Christian schools wrote the Commissioner, rejecting state approval. *See* Defendants' Exhibits 15a–15f.

In 1980, MACS drafted and sponsored two bills for presentation to the 109th Maine Legislature. Both bills provided that church schools which declare their religious convictions against state approval would be exempt from state approval requirements. The legislature rejected both bills in March 1980.

After the defeat of these bills, MACS formally prohibited its members from accepting or retaining school approval.

The Department wrote the unapproved church schools requesting the information needed to determine their eligibility for approval.

On May 29, 1980, MACS' new attorney, William Ball, Esquire, wrote the Commissioner requesting information concerning the Maine compulsory education statutes and regulations. Attorney Ball asked the Commissioner to explain the *statutory* basis for *regulations* requiring private schools, as a prerequisite to approval, to submit a statement of (1) educational philosophy, goals and objectives, and a plan for accomplishing the same; (2) the "methods and procedures" to be utilized to measure attainment of school goals; (3) financial position and policies; and (4) the program of instruction. Attorney Ball asked if the Commissioner interpreted the state regulations as requiring that *private* schools request an inspection of their facilities, curricula and staff qualifications prior to commencement of operations. Attorney Ball inquired whether the Department *regulation prohibiting the operation of unapproved schools* was directed only at public schools and, if not, *what the statutory basis was for such a regulation*, pointing out that though Maine statutes do provide for penalties against parents who enroll their children in a school not approved for attendance purposes, there were no statutes "directed at *schools*" and no statutes forbidding the *operation* of unapproved private schools.

During the 1980–81 school year the dispute between the church schools and the defendants remained at a standoff. The Department attempted to obtain compliance, clarify the approval application form,

---

**10.** The ten schools which have belonged to MACS since 1979, *see* n. 5 *supra,* were among the 19 schools whose pastors or administrators wrote letters to the Commissioner.

**11.** These five schools were located in Hermon, Canaan, Limerick, Clinton and North Whitefield. The latter three were described as "not [having] a conviction against state approval."

and determine whether any particular requirement burdened any school. MACS failed to respond to any of defendants' requests for substantive comments on how the approval regulations could be made less offensive to the religious beliefs of its constituency.

In September, 1980 the Commissioner advised the appropriate public school superintendents that nine Christian schools had opened without state approval. "In order to prevent the students from becoming victims [of the] approval controversy" (Defendants' Exhibit 35), the Commissioner recommended that the superintendents forward to those unapproved church schools, on request, *copies* of the necessary student records in the possession of the public schools, but retain the *original* student records.

On October 14, 1980 the Commissioner instructed all public school superintendents to indicate separately in their 1980–81 enrollment reports those students residing within their school administrative districts who were attending unapproved schools. The Commissioner concluded his letter by stating—"[u]ntil you hear further from this office, you should not take any legal steps to enforce the truancy laws against students attending these unapproved schools." *See* Defendants' Exhibit 36.

On October 9, 1981 the Commissioner formally advised nine unapproved church schools [12] of the Department's intention to "commence a legal action" in state court unless certain information was furnished by October 20, 1981. The Commissioner insisted that "a private school may provide education to children of compulsory school age during hours of the day when such children would otherwise be attending public schools only if it is approved by the Commissioner." The Commissioner stated that approval must be obtained in accordance with the rules adopted by the Department, copies of which had been sent to the schools on September 25, 1981. Enclosing an application form, the Commissioner informed the church schools that the minimum information required to obtain Department approval to operate consisted of evidence that the school

1. has been inspected by the Department of Human Services for compliance with state health and sanitation standards;

2. has been inspected by the Fire Marshal for compliance with the Life Safety code;

3. offers a course of study meeting the minimum curriculum requirements;

4. has an instructional staff which is either certified or qualified for certification; and

5. maintains and safeguards adequate attendance, health and academic records.

The Commissioner allowed that the required information could be provided by authorizing Department representatives to visit the schools, observe their operations and inspect their records.

The original complaint in this action was filed on October 16, 1981.[13] The complaint was amended on October 28, 1981 by adding, as plaintiffs: Bangor Christian, Grace Baptist Church Schools, five churches and the five affiliated unapproved church schools which had received the Commissioner's letter of October 9, 1981.

---

**12.** These nine schools were Kingfield Christian Academy, Farmington Christian School, Lee Christian Schools, Sebec Christian Academy, Victory Christian Schools, Athens Christian Academy, Gardiner Christian Academy, New Life Academy and Windham Assembly Christian Academy. Eight of these schools are plaintiffs in this action. Kingfield Christian Academy has ceased operations. Farmington Christian School is now known as Falls Road Christian School, a plaintiff.

**13.** The original plaintiffs were Bangor Baptist Church and Grace Baptist Church, the pastor of each church, four parents whose children were attending either Bangor Christian or Grace Baptist Church Schools, the principal of Bangor Christian, one teacher from Bangor Christian and one from Grace Baptist Church Schools, and MACS. Bangor Christian and Grace Baptist Church Schools were added as plaintiffs on October 28, 1981.

On October 30, 1981, defendants agreed to refrain from undertaking any enforcement action against the five church schools added as plaintiffs two days earlier.

On November 20, 1981, defendants withdrew their earlier motion that this Court abstain from hearing this case.

On December 4, 1981, defendants filed their answer and a counterclaim against the five plaintiff church schools which had received letters from the Commissioner, as well as four nonplaintiff church schools which had received letters. Plaintiffs joined the latter four church schools as plaintiffs on December 28, 1981.

Prior to trial the parties agreed that although the provisions of Title 20-A of the Maine Revised Statutes Annotated were not to become effective until July 1, 1983, plaintiffs' claims and defendants' counterclaim were to be adjudicated as if those provisions were in effect at the time of trial, since Title 20-A was merely a recodification of pertinent provisions of Title 20.[14]

## II.  *Counterclaim*

The counterclaim presents the ripest controversy and its resolution controls the context in which the Court must determine the ripeness and substance of the claims asserted by the plaintiffs.

The counterclaim alleges that each plaintiff church school: (1) is operating with compulsory-school-age children in attendance, and without state approval; (2) has failed or refused in the past and will refuse in the future to respond to Department requests for information needed to determine its approvability; and (3) if unapprovable, is threatening the health, physical safety and welfare of the children in attendance.

Defendants demand that the Court (1) declare that the failure or refusal to complete and submit the 'Basic School Approval' application or to provide the information requested thereon in some other manner is violative of Maine law; and (2) enjoin the church schools from operating with com-

---

**14.** Disputes as to the constitutionality of legislative enactments are not necessarily unripe merely because the enactments are not effective as of the commencement of the action, *see Colautti v. Franklin,* 439 U.S. 379, 383, 99 S.Ct. 675, 679, 58 L.Ed.2d 596 (1979) [permitting challenge of abortion statute before statute became effective]; *Blanchette v. Connecticut General Insurance Corp.,* 419 U.S. 102, 142–43, 95 S.Ct. 335, 357–58, 42 L.Ed.2d 320 (1974); *Pierce v. Society of Sisters,* 268 U.S. 510, 535–36, 45 S.Ct. 571, 573–74, 69 L.Ed. 1070 (1925); *Arizona v. Atchison, T. & S.F. R. Co.,* 656 F.2d 398, 402–03 (9th Cir.1981), rather their ripeness is determined by considering whether, in view of the need for judicial economy, the surrounding circumstances warrant judicial relief, *see Blanchette v. Connecticut General Insurance Corp.,* 419 U.S. at 144–48, 95 S.Ct. at 359–61. Of the many factors militating in favor of interpreting and testing the constitutionality of the provisions of Title 20-A, the most significant is that the provisions of Title 20-A went into effect on July 1, 1983. The Supreme Court has considered, as relevant to the issue of ripeness, events which took place after the entry of a judgment by a circuit court of appeals. *Buckley v. Valeo,* 424 U.S. 1, 115–17, 96 S.Ct. 612, 680–81, 46 L.Ed.2d 659 (1976). *A fortiori,* events occurring after the commencement of an action and before any decision by the trial court are appropriate for consideration in testing ripeness. *See Lynch v. Dukakis,* 719 F.2d 504 at 509 (1983) [district court acted per-

missibly in finding that defendant "would not comply" with, and in conforming equitable relief to, strictures of statute effective 11 days after the entry of the court's order].

Furthermore, from the outset of this action the validity and intendment of various regulations and statutes, both those which were then, and those which are now, in force, have affected the ongoing relationship between the plaintiff church schools and the defendants. *See Blanchette v. Connecticut General Insurance Corp.,* 419 U.S. at 144, 95 S.Ct. at 359. Finally, the parties have developed the present record in light of the strictures of Title 20-A. *See id.,* at 143, 95 S.Ct., at 358.

Accordingly, the Court is satisfied that the mere fact that Title 20-A went into effect following the commencement of this suit does not bar judicial review of its provisions. Of course, this does not mean that the Court should or must resolve all disputes arising under Title 20-A. " 'Even where some of the provisions of a comprehensive legislative enactment are ripe for adjudication, portions of the enactment not immediately involved are not thereby thrown open for a judicial determination of constitutionality.' " *Id.* at 145–46, 95 S.Ct. at 359, *quoting Communist Party v. SACB,* 367 U.S. 1, 71, 81 S.Ct. 1357, 1397, 6 L.Ed.2d 625 (1961).

In reviewing the provisions of Title 20-A the Court will consider the clarifying amendments made by P.L.1983 c. 485, 1983 Me.Legis.Serv. 2583, which became effective on June 24, 1983.

pulsory-school-age children in attendance during normal public school hours until the church schools submit or make available to the Commissioner the information necessary to demonstrate compliance with state school-approval requirements.

Plaintiffs admit that the plaintiff church schools are unapproved and operating with compulsory-school-age children in attendance, but deny that they have failed or refused to respond to requests for information relating to school *health, sanitation* and *fire safety*.[15]

Plaintiffs affirmatively assert that defendants have an adequate remedy at law and that several of plaintiffs' constitutional claims, including their constitutional claim that various state regulations are *ultra vires*, bar relief under the counterclaim.

Consideration of the counterclaim begins with an examination of the relationship between the Maine statutes governing school attendance, Chapter 211 of Part 3 of Title 20–A, *as amended by* P.L.1983 c. 485, 1983 Me.Legis.Serv. 2583–93, and the statutes relating to private schools, Chapter 117 of Part 2 of Title 20–A.

### Compulsory Attendance and Private Schools

*The core requirement of* the *compulsory attendance* section (§ 5001) of Chapter 211 of the Maine education statutes *is that* *persons age seven or older must attend a public school during its regular annual session until they reach age 17.* 20–A M.R.S.A. § 5001(1), *as amended by* P.L. 1983 c. 485 § 22, 1983 Me.Legis.Serv. at 2590–91. *Exemption* from the *public-*school attendance requirement is accorded students who obtain "equivalent instruction in a *private* school ... and if the equivalent instruction is approved ..." 20–A M.R.S.A. § 5001(2)(D)(1) (*emphasis added*), provided that the appropriate local public school officials receive a certificate reflecting the name and residence of the student seeking exemption and the name of the private school the student is attending, signed by the person or persons in charge of the private school.[16] 20–A M.R.S.A. § 5001(2)(D)(2).

Local public school officials make the initial determination as to whether a student is receiving equivalent instruction in a private school. If local public school officials deny the exemption because the private school instruction is not considered "equivalent," an appeal may be taken to the Commissioner. *Id.* § 5001(2)(D)(2).

In order to come within the relevant [paragraph (D)(1)] statutory exception to the compulsory *public*-school education requirement, a child must not only receive equivalent instruction, but the instruction must be "approved by the Commissioner."[17] An "approved private school" is

---

15. It was stipulated at trial that all of the plaintiff schools are now in compliance with all Maine laws regarding health, sanitation and safety. Tr. III, at 469.

16. Also exempt from compulsory attendance at *public* schools are:

(1) persons who graduate from high school before age 17, *see* 20–A M.R.S.A. § 5001(2)(A);

(2) persons who have (a) completed the 9th grade (or reached age 15), (b) obtained their parents' and their school board's permission to leave school [denial by the board is appealable to the Commissioner, *see* 20–A M.R.S.A. § 5001(3)], and (c) agreed in writing to meet annually until age 17 to review educational needs, 20–A M.R.S.A. § 5001(2)(B);

(3) persons who obtain "equivalent instruction ... in any other manner arranged for by the school committee or the board of directors," provided such instruction is ap- proved by the Commissioner, 20–A M.R.S.A. § 5001(2)(D);

(4) persons age 14 or older participating in a "suitable program of work, work study or training" who have the consent of their parents or guardians and the approval of their principal (appealable to the school board), 20–A M.R.S.A. §§ 5001(2)(E), *as amended by* P.L.1983 c. 485, § 22, 1983 Me.Legis.Serv. at 2591, & 5002; and

(5) persons age 14 or older as to whom the local school board has waived the compulsory education requirement, 20–A M.R.S.A. §§ 5001(2)(E), *as amended by* P.L.1983 c. 485 § 22, *supra*, & 5051(2)(D)(2).

17. As originally adopted 20 M.R.S.A. § 5001(2) provided as follows:

2. *Exceptions.* Compulsory attendance shall not apply to the following:

*A.* Persons who graduate from high school before their 17th birthday;

defined in Title 20–A, section 1(2), as "a private school approved for attendance purposes under chapter 117," 20–A M.R.S.A. § 1(2) (1983); a reference to section 2901, where it is provided that—

[a] private school may operate as an approved private school for meeting the requirement of compulsory school attendance under section 5001 if it:

*1. Hygiene, health, safety.* Meets the standards for hygiene, health and safety under Titles 22 and 25; and

*2.* Is either:

B. Persons who have:
(1) Reached the age of 15 or completed the 9th grade;
(2) Permission to leave school from their parent or legal guardian;
(3) Permission to leave school from the school board or its designee; and
(4) Agreed in writing with their parent or legal guardian and the school board or its designee to meet annually until their 17th birthday to review their educational needs;
C. Students who obtain equivalent instruction in an approved private school shall be credited with attendance at a private school only if a certificate showing their names, residence and attendance at the school, signed by the person or persons in charge of the school, has been filed with the school officials of the administrative unit in which the students reside;
D. Equivalent instruction is as follows:
(1) A child shall be excused from attending a public day school if he obtains equivalent instruction in a private school or in any other manner arranged for by the school committee or the board of directors and if the equivalent instruction is approved by the commissioner; and
(2) If any request to be excused is denied by a local school committee or board of directors, an appeal may be filed with the commissioner. The commissioner shall review the request to be excused to determine whether the local school committee or board of directors has been correct in its finding that no equivalent instruction is available. If the commissioner finds that equivalent instruction is available to the child, he shall approve the request to be excused; or
E. Children shall be credited with attendance at a private school only if a certificate showing their names, residence and attendance at the school, signed by the person or persons in charge of the school, has been filed with the school officials of the administrative unit to which the children reside.
Chapter 485, section 22, of the Maine Public Laws (1983), *supra*, however, repealed para-

A. Currently accredited by the New England Association of Colleges and Secondary Schools; or

B. Meets the department's requirements for approval for attendance purposes under section 2902.[18]

20–A M.R.S.A. § 2901 (1983).

Under a delegation of authority from the Maine Legislature, *see* 20–A M.R.S.A. § 405(3)(E), the Board of Education (Board) has promulgated regulations expressly made applicable to "[p]rivate schools approved for attendance purposes by the de-

graph (C) [without relettering paragraphs (D) or (E)]. The amendment also added to subsection (2) new paragraph (F), which makes clear that the compulsory attendance requirement shall not apply to "[a] person whose absence is excused under section 5002 or 5051."

**18.** Private schools approved for attendance purposes by the department shall:
*1. Immunization.* Comply with the immunization provisions under section 6351;
*2. Language of instruction.* Use English as the language of instruction except as specified under section 4602;
*3. Courses required by statute.* Provide instruction in history as specified under section 4601, subsection 1 and English as specified in section 4601, subsection 2;
*4. Commissioner's basic curriculum.* Provide instruction in the basic curriculum established by rule by the commissioner under section 4601, subsection 4;
*5. Certified teachers.* Employ only certified teachers;
*6. Secondary schools.* For private secondary schools:
A. Meet the requirements of a minimum school year under section 4801;
B. Provide a school day of sufficient length to allow for the operation of its approved education program;
C. Have a student-teacher ratio of not more than 30 to one;
D. Include not less than 2 consecutive grades from 9 to 12; and
E. Maintain adequate, safety (sic) protected records; and
*7. State board rules.* Meet the requirements applicable to the approval of private schools for attendance purposes established by the state board pursuant to section 405, subsection 3, paragraph E.
20–A M.R.S.A. § 2902 (1983).

partment ..." by section 2902 of Title 20–A.[19]

Informed by the statutory definition of the term "approved private school" appearing in sections 2901 and 2902, the Board promulgated a new regulation *during the course of the trial of the present action.*

> A private elementary or secondary school shall not operate *for purposes of meeting the statutory compulsory school attendance requirements* unless it has been approved by the Commissioner of Educational and Cultural Services prior to commencing operation with students present.

05–071 CMR 125, section 1–A, subsection (A)(1) (as amended February 10, 1983) (Defendants' Exhibits 72 & 100–102) (*emphasis added*).

The Board regulations further provide that:

**19.** Section 2902, subsection 7, requires that

> [p]rivate schools *approved for attendance purposes* by the department shall:
> ....
> Meet the requirements applicable to the *approval* of private schools *for attendance purposes* established by the state board pursuant to section 405, subsection 3, paragraph E.

20–A M.R.S.A. § 2902(7) (*emphasis added*). Not surprisingly and as expressly stated in the statute itself (*see* italics), "private schools *approved for attendance purposes* by the Department" must meet the Board requirements "applicable to ... *approval* of private schools *for attendance purposes....* (*Emphasis added.*)

**20.** There appears to be statutory authority for forbidding the operation of schools which are not in compliance with state health, safety and hygiene standards.

> Title 25, section 2392 of Maine Revised Statutes Annotated authorizes the State Fire Marshal or state fire inspectors to "forbid the use of any building or other structure which, (sic) does not conform to the laws, ordinances, rules and regulations promulgated by the Commissioner of Public Safety ... [and] which creates a danger to other property or to the public." (Supp. 1982–83). An order to repair, remove or vacate a structure must be in writing, state a reasonable time within which to undertake such action and be served on the owner and the occupant. 25 M.R.S.A. § 2392. The owner or occupant may within 24 hours of receiving such an order appeal to the Commissioner of Public Safety

> Nine months preceding the day on which the school plans to begin operations, it shall file with the Commissioner a notice of intent to operate a school *for purposes of meeting the compulsory school attendance requirements.*

*Id.,* subsection (A)(2) (*emphasis added*).

The Board regulations relating to private-school health and safety requirements provide that:

> A private school *may not operate* unless it complies with the health and safety requirements of Maine law applicable to schools generally, including the standards for hygiene, health, and safety under Titles 22 and 25 of the Maine Revised Statutes Annotated.[20]

*Id.,* subsection (D)(1) (*emphasis added*).

Subsection I(4) of the Board regulations provides:

> Whenever the Commissioner determines that a private school is operating

who is required to hold a hearing regarding the order and render a final decision on the issue within 30 days after such hearing. Failure to comply with a final order is a Class E crime punishable by a fine of not less than $100. *See also* 25 M.R.S.A. §§ 2357, 2358, 2360 [building inspectors, fire inspectors, municipal officers may order removal or rectification of inflammable conditions dangerous to safety of a building or surrounding premises].

Title 22, section 42(3), authorizes the Department of Human Services to seek to enjoin violations of its rules and regulations relating to plumbing and subsurface sewage disposal.

The local health officer is authorized by statute to require occupants to quit any dwelling place which is unfit for occupancy due to "want of cleanliness or other cause" and which is a cause of sickness to the occupants or the public. 22 M.R.S.A. § 461. He may close the premises until restored to a sanitary condition, *id.,* and in doing so, if he seeks the assistance of "any constable, that constable is required to render assistance." 22 M.R.S.A. § 462. *See also* 22 M.R.S.A. § 1015 [district and superior court judges authorized to issue any order necessary for proper enforcement of statutes and rules relating to communicable diseases]; 22 M.R.S.A. § 1016 [Department of Health and Human Services authorized to order dismissal of all students and employees of any school in the event of an actual or threatened outbreak of communicable disease]; 22 M.R.S.A. § 1561 [local health officer may order removal or discontinuance of any source of filth deemed potentially injurious to health].

with compulsory school-age children in attendance and (a) does not meet the requirements for approval, or (b) has failed or refused to provide information for approval, he may institute proceedings in a court of competent jurisdiction to seek injunctive relief to prevent the non-public school from operating until such time as it meets the requirements for approval or provides information sufficient to demonstrate that it meets the requirements for approval.

*Id.*, subsection (I)(4).

Defendants rely upon Title 20–A, the Board regulations and the equity powers of the Court in support of their requests for declaratory and injunctive relief.

### A. *Application of the Erie Doctrine*

■ Although the counterclaim invokes the Court's ancillary, rather than its diversity, jurisdiction, the choice of law is governed by the Erie doctrine, *see Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

> [I]t is the *source* of the right sued upon, and not the ground on which federal jurisdiction over the case is founded, which determines the governing law....

Thus, the Erie doctrine applies, whatever the ground for federal jurisdiction, to any issue or claim which has its source in state law.... Likewise, the Erie doctrine is inapplicable to claims or issues created and governed by federal law, even if the jurisdiction of the federal court rests on diversity of citizenship.

19 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 4515, at 275 (1982), *quoting Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 540 n. 1 (2d Cir.1956) [*emphasis in original; elipses by* Wright, Miller & Cooper]. Maine law is the *source* of the rights asserted in the counterclaim.

■ According to the great weight of authority,[21] *absent a contrary* federal constitutional or statutory provision, *see Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 674, 70 S.Ct. 876, 880, 94 L.Ed. 1194 (1949) [availability of declaratory relief in diversity case is controlled by 28 U.S.C. § 2201], federal rule, *see Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), or some overriding federal policy, *see Byrd v. Blue Ridge Rural*

---

**21.** Forty-five years after the Supreme Court decided *Erie,* uncertainty still exists as to the extent to which state law controls the power of the federal courts to enjoin violations of state substantive law. Indeed, *Guaranty Trust Company v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), which interpreted *Erie* as requiring a federal court to apply a state statute of limitations to an equitable claim arising under state law, provides seemingly conflicting directives. *York* declares that in resolving disputes in diversity actions the federal court is, "in effect, only another court of the State [and] cannot afford recovery if the right to recover is made unavailable by the State, *nor can it substantially affect the enforcement of the right as given by the state.*" *Id.* at 108–09, 65 S.Ct. at 1469 [*emphasis added*]. It can scarcely be doubted that the availability of alternative or additional equitable remedies in federal, as opposed to state, court may "substantially affect the enforcement of the right." Yet *York* contains the following *dictum* which may be read as divorcing equitable remedies from rights, leaving only the latter to be controlled by state law:

> This does not mean that whatever equitable remedy is available in a State court must be available in a diversity suit in a federal court, or conversely, that a federal court may not

afford an equitable remedy not available in a State court. Equitable relief in a federal court is of course subject to restrictions: the suit must be within the traditional scope of equity as historically evolved in the English Court of Chancery; a plain, adequate and complete remedy at law must be wanting; explicit Congressional curtailment of equity powers must be respected; the constitutional right to trial by jury cannot be evaded. That a State may authorize its courts to give equitable relief unhampered by any or all such restrictions cannot remove these fetters from the federal courts. State law cannot define the remedies which a federal court must give simply because a federal court in diversity jurisdiction is available as an alternative tribunal to the State's courts. Contrariwise, a federal court may afford an equitable remedy for a substantive right recognized by a State even though a State court cannot give it. *Id.* at 105–06, 65 S.Ct. at 1467–68 [citations omitted].

That *dictum* has confounded a number of commentators, *see* 19 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction,* § 4513, at 208, *and notes and comments cited therein.*

*Electric Cooperative, Inc.,* 356 U.S. 525, 533–40, 78 S.Ct. 893, 898–902, 2 L.Ed.2d 953 (1958) [invoking strong federal policy favoring jury trial], federal courts should afford whatever equitable remedy would be available in state court for the enforcement of a right created by state law. *See System Operations, Inc. v. Scientific Games Devel. Corp.,* 555 F.2d 1131, 1143 (3d Cir.1977); *Franke v. Wiltschek,* 209 F.2d 493, 494–95 (2d Cir.1953); *Transcontinental Gas Pipe Line Corp. v. Gault,* 198 F.2d 196 (4th Cir.1952); 2 Moore, *Federal Practice* ¶ 2.09, at 2–58 (1983); 19 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 4513, at 214.

Since in this instance the standards governing the appropriateness of equitable relief are essentially similar under Maine law and federal law,[22] no important federal policy and no federal statute or rule will be contravened as a result of the choice of Maine law.

### B. *Relief Under Statutory and Regulatory Provisions*

Defendants apparently contend that section 2901 empowers the Court to enjoin the operation of the plaintiff church schools during normal public-school hours, regardless of whether injunctive relief would be appropriate under the Court's inherent equity powers. The Maine Law Court recognizes, *see Town of Shapleigh v. Shikles,* 427 A.2d 460, 464 (Me.1981), that where "a statute provides for injunctive relief upon the showing of a violation, the party seeking such relief need not make a showing of

irreparable harm in the normal equity sense," *UV Industries, Inc. v. Posner,* 466 F.Supp. 1251, 1255 (D.Me.1979). But since the "historic injunctive process has been one of great flexibility in administering practical equity, ... [such a provision] should not be lightly implied by the court in construing legislation." *Town of Shapleigh v. Shikles,* 427 A.2d at 464. *Cf. Norfolk Redevelopment & Housing Authority v. Chesapeake & Potomac Telephone Co.,* —— U.S. ——, ——, 104 S.Ct. 304, 307, 78 L.Ed.2d 29 (1983) ["the common law ought not to be deemed repealed, unless the language of a statute be clear and explicit for this purpose"].

▮ Sections 2901 and 2902 neither impose nor delegate the power to impose direct sanctions against unapproved private *schools,* nor do the compulsory attendance provisions of Chapter 211 purport to empower direct action against unapproved private *schools.*[23] The plain legislative design of the Maine Education Law is to ensure that each child attends public school *or* obtains an equivalent education. *One* means [24] of obtaining an equivalent education is to attend an approved private school, that is, a private school which has demonstrated that it is in compliance with sections 2901 and 2902.[25]

### *Administrative Interpretation of Approval Requirements*

The unmistakable import of the statutory school-approval scheme notwithstanding,

---

**22.** As is the case under Maine law, *see* p. 1314 *infra,* absent a contrary statute a request for injunctive relief under federal law implicates the court's discretion and is to be granted only if no adequate remedy at law exists and the competing interests of the parties so indicate, and generally only if the right to relief is clear. *See* 11 Wright & Miller, *Federal Practice and Procedure* § 2942, at 367–68 (1973). However, the reluctance to grant injunctive relief, still prevalent in federal courts, *see id.* at 369–78, appears yet greater in the Maine judicial system. *See* p. 1322 *infra.* Whereas the parameters of judicial discretion to enjoin "crimes" are relatively well defined in the First Circuit, *see United States v. Zenon,* 711 F.2d 476, 479 (1st Cir. 1983), the Court is unaware of any instance in

which the Maine Law Court has addressed this issue.

**23.** The failure or refusal of a private school to obtain Department approval is not necessarily without *indirect* consequences, since in some instances nonapproval could deter attendance.

**24.** *See* n. 16 *supra.*

**25.** Additional *approval* requirements apply to private schools receiving public funds, *see* 20–A M.R.S.A. §§ 2951–55; to those serving only nonresidents, *see* 20–A M.R.S.A. § 3051; and to those offering special or vocational education programs, 20–A M.R.S.A. §§ 3001–02. The plaintiff church schools do not come within any of these special provisions.

the defendants have insisted from the outset[26] that it is implicit in the language of section 2901, which provides that a private school "may operate as an approved private school for meeting the requirements of compulsory school attendance...," that an *unapproved* private school *may not operate at all* during normal public school hours with compulsory-school-age children in attendance. *See* Defendants' Memorandum Regarding *Ultra Vires* Issue, at 6.

■ Although courts do "not lightly disregard the interpretation given a statute by those charged with its administration, an administrative construction is not conclusive." *Soucy v. Board of Trustees*, 456 A.2d 1279, 1281 (Me.1983). "[S]uch deference 'must yield to the fundamental approach of determining the legislative intent, particularly as it is manifest in the language of the statute.'" *Central Maine Power Co. v. Maine Public Utilities Commission*, 458 A.2d 739, 741 (Me.1983), *quoting Central Maine Power Co. v. Maine Public Utilities Commission*, 436 A.2d 880, 885 (Me.1981). An administrative agency construction, even one put forth by those who participated in drafting the statute, may be rejected upon consideration of the plain language of the statute, "the context in which it must be read," *Stewart v. Inhabitants of Durham*, 451 A.2d 308, 310 (Me.1982), or the fact that a different construction will avoid "constitutional difficulties,"[27] *id.* [construction of grandfather clause by town selectmen conflicted with plain meaning and with overall purpose of mobile home ordinance and gave rise to "serious constitutional questions"]. *See also Clardy v. Town of Livermore*, 403 A.2d 779, 782 (1979) [ordinance construed by court contrary to interpretation of town officials, since it was "fairly open to an interpretation making decision (of the constitutional question) unnecessary"]; *Farmington Dowel Products Co., Inc. v. Forster Manufacturing Co., Inc.*, 153 Me. 265, 272, 136 A.2d 542 (1957) [Law Court avoids constitutional question by concluding that a ten-word phrase "crept into the law by some inadvertence..."].

*The plain language of section 2901 is entirely consistent with its long legislative history,[28] leaving no room for an administrative interpretation at odds with both.*

### Language of Statute

If the legislature had meant to ban the *operation* of unapproved private schools,

**26.** Defendants were clearly informed of the Court's concern as to the sufficiency of the statutory basis for the Board regulations no later than October 26, 1982, when the Court denied their motion for summary judgment:

*These* [Board] *regulations may have transformed the scheme selected by the Legislature for the enforcement of the compulsory education laws, i.e., the truancy laws, into an unauthorized administrative system for the licensing of private schools.*
*Bangor Baptist Church v. State of Maine*, 549 F.Supp. 1208, 1231–32 (D.Me.1982).

**27.** "Courts must construe legislative enactments so as to avoid the danger of unconstitutionality ... [since] [t]he cardinal principle of statutory construction is to save, not to destroy," *State v. Davenport*, 326 A.2d 1, 5–6 (Me.1974); a principle "fully consistent with the general rule" of giving effect to legislative intent, since drafters of laws are assumed to have intended those laws to have constitutional sway, *Stewart v. Inhabitants of Durham*, 451 A.2d 308, 311 (Me.1982).

**28.** The legislative history reveals that "the Education Committee [meant] to make [no] ... substantive changes at all in this recodification."

1982 Me.Leg.Rec. 315, 539–40 (House, March 23, 1982 & April 5, 1982) (comments of Rep. Connolly—Chairman of Education Committee). *See also id.* at 315 (comments of Rep. Murphy) [during drafting process, any proposed change that any member of public thought would possibly change meaning was left in its original language]; *id.* at 483–84, 533–34 (Senate, March 31, 1982 & April 1, 1982) (comments of Sen. Trotzky—Chairman of Joint Standing Committee on Education) [no substantive changes were made during drafting process]; *id.* at 539 (House, April 5, 1982) (comments of Rep. Thompson—member of Education Committee) [all agree that the recodification makes no substantive changes]. In fact, in response to objections made to the 110th Legislature by Christian schools, it was specifically stated by legislative leaders that the recodification did not alter the governance of state approval of private schools, *id.* at 315 (comments of Rep. Connolly), and that the recodification was "not intend[ed] to affect the consideration of issues in [this action]," *id.* at 532 (comments of Sen. Trotsky).
*See also* n. 32 *infra*.

"it would have said so in clear and unmistakable language. It is not for [the Court] to read into the statute an intent which is obviously not there," *Squires v. Inhabitants of Augusta,* 155 Me. 151, 167, 153 A.2d 80 (1959). Especially in view of the fact that the present action was commenced months before the 110th Legislature completed its debate on the recodification of the Education Laws,[29] i.e., Title 20-A, it would not have been difficult to draft section 2901 so as to provide that "no private school may *operate* with compulsory-school-age children in attendance unless it meets the private-school approval requirements."[30]

The defendants essentially invite the Court to ignore all language in the opening clause of section 2901 following the phrase "[a] private school may operate...."[31] "Nothing in a statute may be treated as surplusage if a reasonable construction supplying meaning and force is otherwise possible." *Labbe v. Nissen Corp.,* 404 A.2d 564, 567 (Me.1979). *But cf. Farmington Dowel Products Co., Inc. v. Forster Manufacturing Co., Inc., supra.* All of the language rendered mere surplusage un-

der defendants' interpretation becomes imbued with both "meaning and force" by construing section 2901 as a description of the criteria prescribed for *private* schools which may be considered adequate alternatives to *public* schools for compulsory attendance purposes.

### The Statutory Scheme

The Maine statutory scheme of compulsory education is an historically enlightened legislative response to the important parental and public interests inherent in the education of the young; one not lightly to be disregarded by courts, *see Squires v. Inhabitants of Augusta,* 155 Me. at 167, 153 A.2d 80, by municipalities, *see id.,* or by administrators, *cf. Central Maine Power Co. v. Public Utilities Commission,* 458 A.2d at 741; *Maine School Administrative District No. 15 v. Raynolds,* 413 A.2d 523, 529–31 (Me.1980). *See Squires v. Inhabitants of Augusta,* 155 Me. at 159, 153 A.2d 80 ["The State educational policy cannot and must not be interfered with by any subordinate governing body."] In order to determine the legislative intent in relation to a particular section of a comprehensive

---

**29.** *See* 1982 Me.Leg.Rec. 540 (House, April 5, 1982).

**30.** Instead, the terminology used in section 2901 contrasts sharply with that used in the statutes enacted in 1975 regulating day care facilities and nursery schools. *See* 22 M.R.S.A. §§ 7801–04, 8301, 8404. Whereas section 2901 provides that "[a] private school may operate as an approved private school...," the statutes regulating day care facilities and nursery schools provide that "[n]o person, firm, corporation or association shall operate a nursery school [or day care facility] without having ... a written license therefor from the Department of Human Services." 22 M.R.S.A. §§ 7801, 8402.

Also conspicuously absent from the subchapter of the *statutes* governing basic approval of private schools are provisions limiting administrative discretion in prescribing licensing requirements, *see* 22 M.R.S.A. § 8402(1), requiring prompt issuance of licenses, *see* 22 M.R.S.A. § 8402(4), setting license fees and terms, *see* 22 M.R.S.A. §§ 7801(2), 8303, 8402(2) & (5), authorizing the issuance of temporary or conditional licenses, *see* 22 M.R.S.A. § 7802(2)–(4), authorizing hearings under the Maine Administrative Procedure Act for any person whose *ini-*

*tial* application for a license has been denied, *see* 22 M.R.S.A. § 7802(5)(D) (*compare* 20–A M.R.S.A. §§ 2904–05 [hearings for nonrenewal and removal of approval], *with* 05–071 CMR 125 section 1–A(I)(2) [Commissioner makes final determination as to initial approval] ), requiring an Administrative Court proceeding prior to suspension or revocation of a license, *see* 22 M.R.S.A. § 7803(1); 5 M.R.S.A. § 10051(2), and granting regulators the right of entry to inspect licensed facilities for compliance, *see* 22 M.R.S.A. § 7804.

A comparison of the elaborate protective provisions in the statutes governing day care facilities and nursery schools further demonstrates that Chapter 117, subchapter 1, of the education laws was not viewed by the legislature as establishing a private-school *licensing* scheme. Had such a licensing scheme been intended by the legislature it seems inconceivable that something at least remotely similar to the restrictive language and procedural safeguards of Title 22 would not have been used.

**31.** Defendants would read section 2901 as though written: "A private school may operate ~~as an approved private school for meeting the requirement of compulsory school attendance under section 5001~~ if it: ..."

statute, courts should consider the statutory scheme in its entirety and "interpret[ ] [the] statute ... so that all of its provisions are read in harmony and are effectuated." *Seven Islands Land Company v. Maine Land Use Regulation Commission,* 450 A.2d 475, 480 (Me.1982). Yet defendants' construction of section 2901 ill serves, indeed it dramatically alters, the long-standing legislative scheme underlying compulsory education in Maine.[32]

Compulsory-school-age children who fail to establish their entitlement to an exemption from the requirement of *public* school attendance are considered "habitual truants" if "[a]bsent from school without excuse for the equivalent of 10 full days, or for at least ½ day on 7 consecutive days, within any 6-month period." 20–A M.R.S.A. § 5051(1). Any person who has control over an habitual truant and bears primary responsibility for that truancy is guilty of a "civil violation" and "shall be punished by a forfeiture of not more than $200," 20–A M.R.S.A. § 5053(4)(A)(1), payable "to the treasurer of the school administrative unit in which the offense was committed for the support of its public schools." 20–A M.R.S.A. § 5053(4)(B).

The Maine Legislature has prescribed detailed procedural safeguards and placed primary reliance upon *local* public school officials for the conciliation of truancy disputes and for the enforcement of the truancy laws. *Local* public school officials are directed, under the Commissioner's guidance, to promulgate reasonable rules for the enforcement of the truancy laws. 20–A M.R.S.A. § 5003.

It is the *statutory duty* of the public school principal to report an habitual truant to the public school superintendent, whose *statutory duty* it is to attempt. to resolve the problem informally and, if unsuccessful, to refer the matter to the *local* school board, together "with the principal's report and any other useful information." 20–A M.R.S.A. § 5051(2)(A)–(B). It is the duty of the school board to hear the matter after giving seven days' written notice to the parent or guardian of the alleged truant, stating the date, time and purpose of the hearing, the necessity that parents and child attend, and the right to inspect the child's attendance records and the principal's report. 20–A M.R.S.A. § 5051(2)(C).

After considering the facts and discussing the matter with the child and with the parent or guardian, the local board is required *either* (1) to direct the child to attend school as required by statute and inform the parent or guardian of the legal responsibility to assure the child's attendance, *or* (2) to waive the compulsory attendance requirement, provided the child is at least 14 years old. 20–A M.R.S.A. § 5051(2)(D).

A decision adverse to the parent or guardian may be appealed to the Commissioner, who is required to appoint "a fair hearing officer" to hear the appeal and report on the testimony presented, recommending a disposition to the Commissioner, who is required to affirm, modify or rev-

**32.** Defendants' construction of section 2901 is also at odds with the crystal clear language of the private-school approval section as it existed from its legislative inception in 1955 until the recodification of the education statutes in 1982. As originally enacted, *see* P.L.1955, c. 369, § 1, and as it remained through 1981, the approval section read "no school *shall be given basic approval* for attendance, tuition or subsidy purpose ... unless it meets the following requirements...." *See* 20 M.R.S.A. § 1281 (1982–83 Supp.) *(emphasis added).* There was not the slightest legislative intimation that this provision empowered the closing of any unapproved school by anyone, whether administrator or judge.

The 1982 recodification separated the matter contained in 20 M.R.S.A. § 1281 into five sections of title 20–A. *See* 20–A M.R.S.A. §§ 2901, 2951, 4401, 4404, 4801. Section 1281 was amended, by section 2901, to read: "A private school may operate as an approved private school for meeting the requirement of compulsory school attendance under section 5001 if it...." 20–A M.R.S.A. § 2901 (1981). There is not a whisper in its legislative history which would hint that this amendment represented a departure from the legislative intent of section 1281 as it had existed for over 25 years. *See, e.g.,* n. 28 *supra.* Similarly, the preamble to P.L.1983 c. 485, indicates that the amendments made by that law were intended to resolve "existing ambiguities."

erse the decision of the local school board.[33] 20–A M.R.S.A. § 5051(2)(E).

Attendance officers elected yearly by the school board are required to investigate alleged habitual truancies and report to the school board. Upon the written direction of the school board or the superintendent, attendance officers are required to file a complaint in Maine district court seeking imposition of the forfeitures prescribed by section 5053. 20–A M.R.S.A. § 5052(2).

Defendants' interpretation of the education laws would arrogate to the Commissioner the powers and responsibilities entrusted by the legislature to *local* public school authorities, *see* 20–A M.R.S.A. § 2 (1981), and eliminate entirely the sensitive administrative safeguards of notice, hearing and conciliation which are prerequisite to the commencement of any judicial proceeding for the enforcement of the truancy laws.

The 110th Legislature recodified, *without substantive change,*[34] the various long-standing statutory provisions prescribing truancy sanctions against parents, *see* 20–A M.R.S.A. §§ 2901, 2902, 5001(1), (2)(D), & 5051–53, notwithstanding the fact that plaintiffs' present counsel pointed out to the Commissioner as early as May 1980 that there did not appear to be any statutory basis for prohibiting the operation of unapproved schools.

Under its scheme for the governance of compulsory education the 110th Legislature has mandated that local public school officials make every reasonable effort at conciliation with the parents of alleged truants prior to the commencement of administrative action. Next, the legislature has prescribed several levels of administrative proceedings in advance of any recourse to judicial action. Nowhere in this elaborate statutory scheme is there the slightest indication that the legislature meant to permit the circumvention of these procedural *requirements* merely because the Commissioner or any other defendant may consider

the closing of private schools more appropriate than truancy-law enforcement against parents.

### Inviting Unnecessary Constitutional Issues

Defendants' construction is not only at odds with the legislative scheme, it gratuitously raises grave constitutional problems. *See United States v. Lee,* 455 U.S. 252, 257–58, 102 S.Ct. 1051, 1055, 71 L.Ed.2d 127 (1982) [limitations on religious liberty must be "essential to accomplish an overriding governmental interest"]; *Johnson v. Robison,* 415 U.S. 361, 384–86, 94 S.Ct. 1160, 1174–75, 39 L.Ed.2d 389 (1974) [distinguishing between direct and indirect burdens on religion]; *Braunfeld v. Brown,* 366 U.S. 599, 605–07, 81 S.Ct. 1144, 1146–48, 6 L.Ed.2d 563 (1961) [plurality opinion] [regulation of secular activity, so as indirectly to make religious practice more expensive, "wholly different" from legislative attempts to make religious practice unlawful]; *Pierce v. Society of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925) [statute seriously (though indirectly) impairing value of property of private schools, held unconstitutional]. *See also Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 558–59, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975) ["presumption against prior restraints is heavier—and the degree of protection broader—than that against limits on expression imposed by criminal penalties"]; *Kunz v. New York,* 340 U.S. 290, 293–95, 71 S.Ct. 312, 314–15, 95 L.Ed. 280 (1951) [ordinance giving police commissioner unbridled discretion to grant or refuse permits to speak on religious matters in public streets was invalid prior restraint on exercise of First Amendment rights]; *Martin v. City of Struthers,* 319 U.S. 141, 146–49, 63 S.Ct. 862, 864–66, 87 L.Ed. 1313 (1943) [ordinance forbidding knocking on doors or ringing doorbells in order to distribute handbills or circulars was invalid as applied

---

**33.** There is no right of appeal to the Commissioner if the local board *waives* the compulsory attendance requirement.

**34.** *See* nn. 28 & 32 *supra.*

to Jehovah's Witness seeking to advertise religious meeting, despite state claim of nuisance]. *See generally* Jeffries, *Rethinking Prior Restraint,* 92 Yale L.J. 409 (1983).

### Legislative Acquiescence

Struggling against the clear language, history and legislative scheme of the compulsory education statutes and disregarding the serious constitutional difficulties raised by their efforts to close church-affiliated schools, defendants contend that their construction of section 2901 is binding on the Court because the 109th Legislature acquiesced in their construction.

Legislative acquiescence offers a precarious perch from which to construe a statute even in the best of circumstances. Legislative acquiescence is "significant" in assessing the intent of a Maine legislature, if the administrative interpretation is reasonable, has been called to the attention of a legislature subsequent to the enacting legislature and if it is reasonably inferable that the administrative interpretation was recognized by the later legislature as a valid construction. *See In re Spring Valley Development,* 300 A.2d 736, 743–45 (Me.1973) [after attention of 105th Legislature had been specifically directed to administrative interpretation of bill enacted by 104th, actions of 105th became "significant" in assessing intent of 104th]. *See also Androscoggin County Savings Bank v. Campbell,* 282 A.2d 858, 865 (Me.1971) [ambiguous statutory amendments in 1969 not to be construed as contrary either to 1917 Attorney General's opinion or to interpretation given by banking commissioners since 1917].

MACS sponsored two bills before the 109th Legislature (L.D.1817 and L.D.1980) to exempt church-sponsored schools from the school approval requirements. Since each bill stated that it was designed to "make approval optional for church-sponsored schools," and would have exempted these schools from approval *and* their students from compliance with the compulsory *public*-school attendance law, it is fair to infer either that someone involved in drafting these bills knew of the Commissioner's interpretation or that the drafter thought that approval was or might be considered a condition precedent to the lawful operation of a private school. But both the trial record and the legislative record make clear that these bills were sponsored, and, at least initially, probably drafted, by MACS, which was well aware of the Commissioner's consistent contention that an unapproved private school cannot operate at all with compulsory-school-age children in attendance, *see, e.g.,* pp. 1307–1308 *supra. See* 1980 Me.Leg.Rec. 387 (House, March 10, 1980) [Senator Trotzky stating, "This bill was brought in by (MACS)"].

Much of the floor debate centered on the right and duty of the state to influence or control sectarian schools, *see id.,* at 344–50 (House, March 10, 1980); *id.,* at 386–87 (Senate, March 11, 1980), but it does not follow that the legislature was aware that the Commissioner considered Department approval to be a precondition for lawful operation.[35] Certainly, subjecting the par-

---

**35.** The following paragraph from the statement submitted to the Education Committee by the Department contains the only hint in the legislative history of these bills that the legislature may have been aware of the Commissioner's interpretation of the compulsory education laws:

> In conclusion, the Department recognizes that private, religious schools have a place in the State and that they provide a legitimate alternative to public schools. However, the Department also feels it is essential that these schools meet the minimum standards required by the Maine Constitution and by the Legislature which all schools must abide by to be able to operate in the State of Maine.

But since the statutory provisions then in force provided *absolutely no basis* for the power the Commissioner claims to have had (and still have), *see* n. 32 *supra,* it is inconceivable that the legislature understood and accepted the full import of this assertion, *without discussion.* Indeed, the remainder of the Department's Statement indicates that the Department understood the approval scheme to mean only that *"if* non-public, *private schools are going to be used to satisfy the compulsory attendance law, then* these schools must comply with certain minimum standards and be approved...." *(Emphasis added.)*

ents of children attending church schools to truancy actions (the legislatively-contemplated response to nonapproval, which has only since been disavowed by the Commissioner) would have a significant effect on the schools, thereby affording the state substantial *de facto* control over the church schools. Furthermore, there is not the slightest indication in the record of this case or in the legislative record from which it reasonably could be inferred that the 109th Legislature recognized the Commissioner's interpretation as valid.

In the context of the present case there is no ambiguity requiring resort to "legislative" acquiescence, no pertinent administrative interpretation was called to the attention of the 109th Legislature and its reasons for rejecting L.D.1817 and L.D.1980 were unrelated to whether the Commissioner is or ever has been empowered by statute to close unapproved private schools.

■ The Court is therefore satisfied that neither section 2901 nor any other statutory provision prohibits private schools from operating merely because they are unapproved or refuse to seek or accept approval. *A fortiori*, no statutory provision *requires* the Court to fashion injunctive remedies against the operation of unapproved private schools without due regard for the public and private interests involved.

The statement by the Commissioner before the Education Committee on February 14, 1980 likewise indicates that the proposed amendments were an effort to chart an optional path for certain church-affiliated schools to qualify as suitable alternatives to public day schools, rather than to repeal any existing law which might be perceived as authorizing direct action to close unapproved private schools. *See* Defendants' Exhibit 19, Statement of Commissioner Raynolds (February 14, 1980) [in order to satisfy compulsory attendance requirement through attendance at private school, the private school must meet certain standards].

Moreover, had the 109th Legislature understood, agreed with and "acquiesced" in the Commissioner's interpretation, the 110th Legislature could have adopted unambiguous language to that effect as part of its recodification of the education laws, without doing violence to its policy of making no substantive change, *see* nn.

## The Regulatory Scheme

Subsection I(4) of the regulations purports to authorize the Commissioner to "seek" injunctions against the operation of unapproved private schools. The Board regulations neither expressly prohibit nor purport to empower injunctive relief against the operation of unapproved private schools; any such regulation would be invalid.

■ A "legislative" rule [36] is valid only if the legislature has authorized its promulgation. *Anheuser-Busch, Inc. v. Walton*, 135 Me. 57, 190 A. 297 (1937). *See Maine School Admin. Dist. No. 15 v. Raynolds*, 413 A.2d at 529; *State v. Dube*, 409 A.2d 1102, 1104 (Me.1979); *Frank v. Assessors of Skowhegan*, 329 A.2d 167, 170 (Me.1974). Thus a legislative rule is void if it extends, modifies or conflicts with the enabling statute. *Anheuser-Busch, Inc. v. Walton*, 135 Me. at 66–68, 190 A. 297; 1 Cooper, *State Administrative Law* 254 (1965). *See Frank v. Assessors of Skowhegan*, 329 A.2d at 170. The relevant enabling statute, *see* 20–A M.R.S.A. § 405(3)(E), merely directs the Board to "[a]dopt or amend rules *on requirements for approval and accreditation* of elementary and secondary schools." 20–A M.R.S.A. § 405(3)(E). The statutory directive to adopt rules governing "approval" and "accreditation" is designed to ensure greater definition of the criteria for exemption from compulsory

28 & 32 *supra*. Instead, the wording of sections 405(3)(E), 2901, 2902, 5001(1) and 5051–53 of new Title 20–A makes clear that private school "approval" is, as it has always been, merely the means of satisfying one of the exceptions to compulsory public school attendance. *See* n. 16 *supra* & p. 1327 *infra*. Under these circumstances a finding of "legislative acquiescence" would represent a reckless approach to statutory construction.

36. *Legislative* rules are products of the exercise of delegated power to create law through rules. 2 K. Davis, *Administrative Law Treatise* § 7:8 (2d ed. 1979). If valid, legislative rules are binding on courts. On the other hand, *interpretative* rules, which merely represent the administering agency's interpretation of existing law, may issue without an express delegation of authority. *Id.*

*public* school attendance available to *students* attending approved private schools, and forms a comfortable fit within the legislative scheme of the compulsory education laws, by focusing enforcement efforts upon the *individual student and parent.*

The defendants apparently assert that the Board is empowered to authorize the Commissioner to bypass the elaborate truancy-law enforcement scheme put in place by the legislature by proceeding directly to court for injunctive relief against the operation of unapproved private schools. Although the *defendants* may consider the closing of unapproved private schools in these circumstances a more efficient and expeditious means of securing compliance with the compulsory education laws on the part of private school students and their parents,[37] it is not for the defendants, but for the legislature, if and when it chooses, to do so, and the legislature has not chosen to do so.

In its recent recodification of the education laws the 110th Legislature manifested no intention to redirect enforcement sanctions from the parents of students attending unapproved private schools to the unapproved private schools themselves. *See* pp. 1316–1318 *supra.* As the Law Court has held in an analogous context:

> [The Commission's] power to make rules and regulations extends only to such details of administration as are necessary to carry out and enforce the mandate of the legislature. What the [Commission] has attempted to do in this instance constitutes a flagrant usurpation of a prerogative which belongs to the legislature, and is subversive of those principles which are the foundation of orderly government. The regulations in question are invalid....

*Anheuser-Busch, Inc. v. Walton,* 135 Me. at 67–68, 190 A. 297 [involving rules and regulations of State Liquor Commission].

■ Similarly, to the extent that the board regulations attempt to institute a scheme whereby private schools can *operate* only if approved, the Board has exceeded its power and its regulations are invalid.[38]

### C. Relief Under the Inherent Equity Powers of the Court

■ Requests for injunctive relief are addressed "to the conscience of the chancellor...," *Town of Shapleigh v. Shikles,* 427 A.2d at 465, who is guided by the balance between the needs of the party requesting injunctive relief and the hardship which injunctive relief would visit upon the party enjoined, *Town of Shapleigh v. Shikles,* 427 A.2d at 464; *Natale v. Kennebunkport Board of Zoning Appeals,* 363 A.2d 1372, 1377 n. 9 (Me.1976), and by the public interest, *see Ingraham v. University of Maine at Orono,* 441 A.2d 691, 693 (Me.1982);[39] Note, *Developments*

---

**37.** The Commissioner states that although children attending unapproved private schools may be considered habitual truants, he has discouraged local school superintendents from truancy actions, because their parents might be acting in the "good faith belief that their children [were] receiving the benefits and protections of the State's compulsory education laws," and because truancy actions on a broad scale would be "unduly burdensome" and expensive for local school officials, the Department and the courts. *See* Affidavit of Commissioner Raynolds, dated April 20, 1982, at 5.

**38.** If considered interpretative, as opposed to legislative, the regulations, of course, are not binding on the Court. *See Soucy v. Board of Trustees,* 456 A.2d 1279, 1281 (Me.1983); *General Electric Co. v. Gilbert,* 429 U.S. 125, 141, 97 S.Ct. 401, 410, 50 L.Ed.2d 343 (1976); *Skidmore*

*v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944); 2 Davis, *Administrative Law Treatise* § 7:10, *supra.* *Cf. Maine School Admin. Dist. No. 15 v. Raynolds,* 413 A.2d 523, 531 (Me.1980) [indicating that an administrator's interpretation of regulation does not bind courts].

**39.** The *Ingraham* court stated,

> Before granting a preliminary or permanent injunction, the Court must find that four criteria are met:
> (1) that plaintiff will suffer irreparable injury if the injunction is not granted,
> (2) that such injury outweighs any harm which granting the injunctive relief would inflict on the defendant,
> (3) that plaintiff has exhibited a likelihood of success on the merits (at most, a probability; at least, a substantial possibility),

*in the Law—Injunctions*, 78 Harv.L.Rev. 994, 1001 (1965). The Law Court "has always been conservative" in its approach to the appropriateness of injunctive relief, *Haskell v. Thurston*, 80 Me. 129, 132, 13 A. 273 (1888), which is "extraordinary [relief] only to be granted with the utmost caution when justice urgently demands it and the remedies at law fail to meet the requirements of the case." *Bar Harbor Banking & Trust Co. v. Alexander*, 411 A.2d 74, 79 (Me.1980). Thus, the *need* for injunctive relief is *per se* insufficient, unless the moving party "show[s] plainly that [his] right is clear," *Haskell v. Thurston*, 80 Me. at 132, 13 A. 273, and that absent injunctive relief the violation of that right will cause irreparable injury, *Bar Harbor Banking & Trust Co. v. Alexander*, 411 A.2d at 79.

### Defendants' Need

#### (i) The Right Violated

The contention that the operation of unapproved private schools contravenes section 2901 must fail for the reasons previously discussed. The other relevant respect in which the plaintiff church schools are alleged to have acted unlawfully is by "inducing habitual truancy."

The defendants assert that "the record evidence ... demonstrates beyond any question that ... [the ten church schools and the pastors and administrators in charge of those schools] induce their students to attend their unapproved schools." Defendants' Memorandum Regarding Ultra Vires Issue, at 10. On the basis of the entire record in this case there appear to be but two plausible forms which any such "inducement" of habitual truancy might take: first, that the very operation of an unapproved church school with compulsory-school-age children in attendance constitutes an inducement of habitual truancy;

(4) that the public interest will not be adversely affected by granting the injunction. *Ingraham v. University of Maine at Orono*, 441 A.2d 691, 693 (Me.1982). But although the Law Court referred to "preliminary" and "permanent" injunctions, it does not appear that *Ingraham* establishes a four-point talismanic test for determining the propriety of permanent injunctive relief. Rather, the court was defining the

and second, that the pastors or administrators induce students to attend their church schools by communicating their religious belief that the Bible commands Christians to establish schools in order to instill biblical principles and that Christ is the sole sovereign in such matters. *See* Plaintiffs' Proposed Findings, ¶¶ 11, 13, 17, 21–25, 27, 31, 63–64, and transcript citations therein.

Title 20–A M.R.S.A. § 5053(1)(B) provides that it shall be a "civil violation" to induce a student to violate section 5051, subsection 1 (defining habitual truancy). *See State v. McDonough*, 468 A.2d 977 at 980 n. 5 (Me.1983) [offense of being primarily responsible for the habitual truancy of a student under one's control is a civil violation]. "A person guilty of" inducing habitual truancy "shall be punished by a forfeiture of *not less* than $500," 20–A M.R.S.A. § 5053(4)(A)(2), payable "to the treasurer of the school administrative unit in which the offense was committed for the support of its public schools," *id.* § 5053(4)(B). (*Emphasis added.*)

■ Under Maine law the *operation* of an unapproved church school attended by compulsory-school-age children does not constitute an inducement of habitual truancy. The Maine Supreme Judicial Court authoritatively defines the term "induce" as follows:

Webster's New International Dictionary, 2d Ed., defines 'induce' as 'to bring on or about; to effect; cause.' Black's Law Dictionary, 4th Ed., defines 'induce' as 'to bring on or about, to effect, cause to influence to an act or course of conduct, lead by persuasion or reasoning; incite by motives, prevail on.' The term induce signifies a successful persuasion; that the act has been effective and the desired result obtained. *State v. Stratford*, 55

test controlling its power to grant injunctions under Me.R.Civ.P. 62(g). This conclusion finds support in the Law Court's citation to *Women's Community Health Center v. Cohen*, 477 F.Supp. 542, 544 (D.Me.1979), which summarized the test in the First Circuit for granting a preliminary injunction, and further support in the reference to "*a likelihood* of success on the merits." (*Emphasis added.*)

Idaho 65, 37 P.2d 681 (1934); *Hautau v. Kearney & Trecker Corporation,* 179 F.Supp. 490 (D.C.1959); Vol. 21 Words and Phrases, Permanent Ed., p. 481. *State v. Miller,* 252 A.2d 321, 324–35 (Me. 1969) [inducing one to take indecent liberties means that *persuasion* has resulted in the doing of the indecent act]. Other courts similarly hold that to "induce" requires some form of *persuasion. International Brotherhood of Electrical Workers v. National Labor Relations Board,* 341 U.S. 694, 701–04 & n. 7, 71 S.Ct. 954, 958–59 & n. 7, 95 L.Ed. 1299 (1951) ["induce" in N.L.R.A. means to lead on; to influence; to prevail on; to move by *persuasion* or *influence* ]; *United States v. Burkley,* 591 F.2d 903, 917 (D.C.Cir.1978) [relative to entrapment defense, inducement refers to government *persuasion, harassment* or other *pressure* on defendant to commit the crime]; *Fromberg, Inc. v. Thornhill,* 315 F.2d 407, 411 (5th Cir.1963) [under statute forbidding active inducement of patent infringement, inducement "has connotations of active steps knowingly taken ... as distinguished from accidental or inadvertent]; *In the Matter of Kearney Chemicals, Inc.,* 468 F.Supp. 1107, 1111 (D.Del.1979) [in tort case for inducing breach of contract, "induce" refers to causing one by *persuasion* or *intimidation* to choose one course of conduct over another].

These judicial definitions conform to the meaning commonly given the term "induce," which involves some form of persuasion or influence as an essential element.

The fact that "inducing" habitual truancy carries a substantially more stringent penalty (forfeiture of *not less* than $500) than does the offense of being primarily

responsible for the truancy of a child under one's control (forfeiture of *not more* than $200) makes clear that the legislature considers inducing habitual truancy to be a more serious matter than "being responsible" for truancy. Indeed, the Statement of Fact accompanying the 1981 bill, which reduced the penalties for these offenses, stated, "This bill ... would change the penalty section for a parent responsible for truancy to a civil violation punishable by either a $200 or a $500 [40] forfeiture, *depending on the nature of the offense.*" 110th Me. Leg., H.P. 1177, L.D. 1401, [*emphasis added* ], enacted as amended P.L.1981 c. 391 § 1, 1981 Laws of Maine at 620. An interpretation removing the element of persuasion from the ordinary meaning of "induce" would disregard the clear legislative directive that the penalty for "inducing" habitual truancy should apply only to conduct more severe than merely "being responsible" for truancy.

In recognition of the judicial "obligation to avoid constitutional decisions when other grounds are available," *Morris v. Travisono,* 707 F.2d 28, 33 (1st Cir.1983), the Court concludes that *mere operation* of these unapproved church schools with compulsory-school-age children in attendance does not constitute an inducement of habitual truancy.[41] Indeed, since defendants allege that the plaintiffs "operate schools for compulsory school age children ... *and* ... induce their students to attend,*" Defendants' Memorandum Regarding Ultra Vires Issue, at 10, it is not entirely clear that defendants contend that the mere operation of an unapproved school constitutes an "inducing." And, even assuming the

---

**40.** L.D. 1401 prescribed forfeitures of not less than $200 and not less than $500, but was changed by Committee Amendment A, 110th Me.Leg., Filing No. H–396, to provide that the penalty for being responsible for a child's truancy is a forfeiture of "not *more* than $200."

**41.** Whether the plaintiff-pastors in some other way may have induced habitual truancy within the meaning of the statute is irrelevant to this counterclaim. "The 'principles of equity jurisprudence' suggest that 'the scope of injunctive relief is dictated by the extent of the violation

established ... [and] the relief afforded [may not be] more burdensome than necessary to redress the complaining parties.'" *Lynch v. Dukakis, supra* at 514, *quoting Califano v. Yamasaki,* 442 U.S. 682, 702, 99 S.Ct. 2545, 2558, 61 L.Ed.2d 176 (1979). *See Town of Shapleigh v. Shikles,* 427 A.2d at 464. Enjoining the operation of unapproved church schools would be an overbroad response to the transgressions of individuals encouraging attendance at those schools.

**1324**

contrary, under the equities of this case injunctive relief is inappropriate.

### Irreparable Injury

■ There can be no irreparable injury where adequate relief is available at law. *Bar Harbor Banking & Trust Co. v. Alexander,* 411 A.2d at 79; 11 Wright and Miller, *Federal Practice and Procedure* § 2944, at 392 (1973). "If the legal remedy available to the plaintiff would be as effective as ... [injunctive] relief, there is no need for the court to invoke its equity jurisdiction." [42] *Id.* at 396.

■ An available legal remedy generally is considered inadequate if it can be secured only through a multiplicity of actions, as when the conduct is likely to be of a recurring nature. *Id.* at 397–98. But even if the operation of unapproved schools does constitute an inducement of habitual truancy, there is no reason to suppose that prosecutions under section 5053(1)(B) would be inadequate or need be multiplicious. It does not appear that the authorized penalty, i.e., a forfeiture of *not less than* $500, is inadequate to prevent recur-

ring violations. *Cf. City of Tupelo v. Walton,* 237 Miss. 892, 116 So.2d 808 (1960) [owner enjoined from operating store in violation of Sunday closing law where authorized fine was insignificant, and owner had 75 prior convictions and statute authorized injunction]; *State v. Preuss,* 217 Minn. 100, 13 N.W.2d 774 (1944) [25 prior convictions].

There are two principal reasons advanced in explanation of the customary judicial reluctance to enjoin the commission of a crime, *see, e.g., United States v. Zenon,* 711 F.2d 476, 479 (1st Cir.1983); *Dommer v. Crawford,* 638 F.2d 1031, 1047 (7th Cir. 1980); *United States v. Jalas,* 409 F.2d 358, 360 (7th Cir.1969); 11 Wright & Miller, *Federal Practice and Procedure* § 2942, at 386 (1973); Note, *Developments in the Law—Injunctions,* 78 Harv.L.Rev. at 1013. The first reason, i.e., "concern for rights [of the alleged offender] to the safeguards of criminal procedure," *United States v. Zenon,* 711 F.2d at 479, has been criticized, with some justification, as illogical,[43] and, in any event, may be inapposite here.[44]

---

**42.** Of course, the state need not show the inadequacy of a criminal law remedy were it to appear that the *legislature* has authorized civil injunctive relief against future violations of the substantive law. *United States v. Cappetto,* 502 F.2d 1351, 1358–59 (7th Cir.1974).

**43.** The nature of the sanction is central to the determination as to whether a proceeding is criminal. *See* n. 44 *infra.* Obviously, injunctive relief is not a sanction endemic to criminal law. Nothing is gained by noting that violation of the injunction may lead to a finding of contempt and to eventual imprisonment, for that is so irrespective of the nature of the conduct (civil or criminal) forming the basis for the injunction.

The argument [that the constitutional rights of criminal defendants preclude injunctions against crimes] contains a more fundamental weakness: it assumes that one of the purposes in enacting a criminal statute is to give special protection to the defendant or to the conduct the statute proscribes. Suppose, for example, that state *A* makes criminal the maintenance of a certain nuisance and that state *B* does not, but will issue an injunction against it. It is anomalous that state *A,* which has manifested its policy by penal legislation, should be thought to be more solicitous of the defendant's welfare than state *B,* whose legislature

has not acted. Yet, according to the argument, a court of state *A* should be disabled from enjoining the nuisance. Assuming, *arguendo,* that trial by jury would be a desirable feature of either the civil or criminal aspects of injunction procedure, it is hard to see why the injunction defendant whose conduct is also criminal has a greater claim to jury trial than an injunction defendant whose conduct is not criminally proscribed.

Note, *Developments in the Law—Injunctions,* 78 Harv.L.Rev. 994, 1019 (1965).

**44.** Whether conduct proscribed by statute is "criminal," thereby implicating the protections of criminal procedure, is, in the first instance, a matter of statutory construction to be determined conformably with the legislative intent. *State v. Anton,* 463 A.2d 703, 705 (Me.1983). *See United States v. Ward,* 448 U.S. 242, 248–49, 100 S.Ct. 2636, 2641, 65 L.Ed.2d 742 (1980). Where the legislature intends the offense to be considered civil, courts must inquire further whether the statutory scheme is "so punitive either in purpose or effect as to negate that intention." *State v. Anton,* 463 A.2d at 706, *quoting United States v. Ward,* 448 U.S. at 249, 100 S.Ct. at 2641.

The 1981 amendment [ch. 391, 1981 Me.Laws 620] to the predecessor of section 5053, i.e., 20

M.R.S.A. § 911, may have been designed to constitute the proscribed conduct (i.e., inducing habitual truancy) a civil violation rather than a criminal offense.

Prior to 1981, inducing habitual truancy had been considered a criminal offense. *See Shaw v. Small*, 124 Me. 36, 40, 125 A. 496 (1924). However, the relevant portion of chapter 391 amended 20 M.R.S.A. § 911(8), as follows:

Any person who induces a child to absent himself from school, or harbors or conceals such child when he is absent ~~shall be punished by a fine of not more than $25 or by imprisonment for not more than 30 days for each offense. If the~~ commits a civil violation for which a forfeiture of not less than $500 shall be adjudged. The court ~~imposes a sentence of probation, it~~ may ~~in its sentence, as a condition of probation~~ require that the ~~convicted~~ person receive professional counseling by a qualified professional counselor who shall be selected by the convicted person, with the approval of the court, or by the court.

The Statement of Fact accompanying the bill, L.D. 1401 (1981), provided in part, "This bill ... would change the penalty section for a parent responsible for truancy to a civil violation punishable by either a $200 or $500 forfeiture, depending on the nature of the offense."

In the process of recodifying the education laws, the legislature inserted the words "guilty" and "punishable," language which might suggest that inducing habitual truancy was to be considered a criminal offense. *See State v. Clayton*, 584 P.2d 1111, 1113 (Alaska 1978). *Clayton* is clearly distinguishable. The Alaska legislature had declared that certain traffic infractions are "not considered criminal." But by focusing on, *inter alia*, the use of certain criminal phraseology in the relevant provisions, the *Clayton* court concluded that the legislature intended the infractions to be "quasi-criminal offenses," *not* "civil in nature." *State v. Clayton*, 584 P.2d at 1113. Section 5053 expressly declares that inducing habitual truancy is a "civil violation." In short, the language embodied in and accompanying the 1981 amendment to 20 M.R.S.A. § 911, the fact that section 5053 declares the "offenses" listed therein to be "civil violations" and the further fact that the subsequent recodification was not intended to effect substantive change, nn. 28 & 32 *supra*, may well warrant the conclusion that the Maine legislature intended that inducing habitual truancy be considered a civil violation.

If so, the safeguards of criminal procedure apply in prosecutions for inducing habitual truancy only if "the statutory scheme ... is 'so punitive in purpose or effect as to negate [the legislature's] intent.'" *State v. Anton*, 463 A.2d at 706, *quoting United States v. Ward*, 448 U.S. at 248, 100 S.Ct. at 2641. The considerations used to determine whether constitutional guarantees apply to "civil" penalty provisions include:

Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned.

*Id.* at 706, *quoting Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963). Thus, the degree of severity of the penalty is important. *Id.* In addition to these factors, courts consider "the nature of the conduct, whether adverse collateral consequences may arise and whether there exists the possibility of pretrial arrest and detention." *Id.* Finally, legislative "use of terminology associated with the criminal law" may undercut the intent to create a civil offense. *Id.* at 708.

### Sanction

Although inducing habitual truancy is no longer punishable by incarceration, it is at least arguable that the authorized "forfeiture" (minimum of $500; with *no maximum*) is "so unreasonable or excessive that it transform[s] what was clearly intended to be a civil penalty into a criminal penalty." *State v. Anton*, 463 A.2d at 707. Certainly the threat of an unlimited fine provides significant deterrence, a "traditional aim[ ] of punishment," *id.* at 706.

### Scienter

As previously discussed, the term "induce," both in legal and lay parlance, connotes intent. Therefore, scienter appears to be an element of the offense of inducing habitual truancy. *See* pp. 1322–1323 *supra*. On the other hand, since it does not appear that an inducement of truancy violates any other "criminal" statute, the conduct to which the prescribed "forfeiture" applies is not "already a crime."

### Statutory Language

The incorporation in section 5053 of the terms "guilty" and "punishment" arguably evidences a legislative determination that inducing habitual truancy is to be condemned, a concept endemic to criminal and not civil law. *Brown v. Multnomah County Dist. Court*, 280 Or. 95, 570 P.2d 52, 59 (1977). *See State v. Anton*, 463 A.2d at 708.

### Arrest and Detention

Although 20-A M.R.S.A. § 5053(3) makes reference to "[w]arrants and legal process" for the enforcement of section 5053, it does not appear that arrest warrants may issue against persons who induce habitual truancy, *see* Me.R.Crim.P. 1, 4 & 9 *and* Me.R.Crim.P. (district court) 1 & 4. For the purpose of obtaining credible identification, a law enforcement officer may detain a person the officer has probable cause to believe

But the second justification: to prevent frustration of the legislatively-prescribed sanction and circumvention of prosecutorial discretion, 11 Wright & Miller, *Federal Practice and Procedure* § 2942, at 386 (1973); Note, *Developments in the Law—Injunctions,* 78 Harv.L.Rev. at 1016, relates to the adequacy of the available legal remedy. The complex enforcement scheme crafted by the legislature and the great latitude left to "prosecutors" under that scheme, *see* pp. 1317–1318 *supra,* speak forcefully in favor of a finding that the sanction selected by the legislature is adequate, regardless of whether inducing habitual truancy be deemed a criminal or civil violation.

*Burden of Injunctive Relief on Plaintiffs*

■ There is a strong presumption against the constitutional validity of any restraint of future expression. *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963). *See also Near v. Minnesota,* 283 U.S. 697, 713–23, 51 S.Ct. 625, 630–33, 75 L.Ed. 1357 (1931) [statute permitting public officials to bring publisher before judge to obtain injunction against publication of scandalous and defamatory matter was an unconstitutional prior restraint].

■ Religious worship and discussion, integral aspects of the curricula of the plaintiff church schools, constitute forms of speech and association entitled to full First Amendment protection. *Widmar v. Vincent,* 454 U.S. 263, 269–70, n. 6, 102 S.Ct. 269, 273–74, n. 6, 70 L.Ed.2d 440 (1981) [state-university regulation prohibiting use of facilities for religious worship and teaching was content-based discrimination against religious speech, not narrowly drawn to serve a compelling state interest]. "[T]he regulation of a communicative activity ... must adhere to more narrowly drawn procedures than is necessary for the abatement of an ordinary nuisance." *Vance v. Universal Amusement Co., Inc.,* 445 U.S. 308, 315, 100 S.Ct. 1156, 1160, 63 L.Ed.2d 413 (1980) [per curiam]. "[T]he burden of supporting an injunction against a future [communication] is even heavier than the burden of justifying the imposition of a criminal sanction for a past communication." *Id.* at 315–16, 100 S.Ct. at 1160–61. "[A] free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand." *Id.* at 316 n. 13, 100 S.Ct. at 1161 n. 13 [*emphasis in original*].[45]

At first glance it may seem superficial to draw a distinction between closing down unapproved church schools, on the one hand, and multiple truancy prosecutions against the parents of unapproved church-school students, on the other. But aside from the singularly sufficient reason that the Maine Legislature has *mandated* truancy-law enforcement and has *never authorized* the closing of a private school by courts or administrators for any reason relevant to the present action, there is a vital difference between the two ap-

---

has committed a civil violation. 17–A M.R.S.A. § 17. But a formal arrest is permitted only if the person refuses or intentionally fails to supply credible identification. *Id.*

Thus, the factors relevant to determining whether a person charged with inducing habitual truancy is entitled to the protections of criminal procedure do indeed "point in different directions," *State v. Anton,* 463 A.2d at 706.

The fact that the offense of being primarily responsible for the habitual truancy of a child who is under one's control has been held to be a civil violation, *State v. McDonough,* 468 A.2d 977 at 980 n. 5 (Me.1983), is not dispositive of the characterization of the offense of inducing habitual truancy. Although both offenses are defined in 20–A M.R.S.A. § 5053, the offense of

"inducing" habitual truancy carries a much more stringent sanction ("forfeiture" of *not less* than $500) than the offense of being primarily responsible for habitual truancy ("forfeiture" of *not more* than $200), and scienter appears to be an element of inducing, but perhaps not of being primarily responsible for, habitual truancy. Therefore, the characterization of the offense, a matter which was neither raised nor briefed by the parties, is better left to the state courts. For present purposes it is sufficient to note that the *possibility* that inducing habitual truancy is a "crime" provides yet another reason to withhold injunctive relief.

**45.** *See also* Hunter, *Toward a Better Understanding of the Prior Restraint Doctrine: A Reply to Professor Mayton,* 67 Cornell L.Rev. 283, 284–87, 292–96 (1982).

proaches and it goes to the heart of the plaintiffs' objections in this case.

Defendants claim a right to close[46] schools which plaintiffs assert are "pervasively sectarian" institutions, *Cuesnongle v. Ramos,* 713 F.2d 881, 883 (1st Cir. 1983),[47] in order to protect the state's interest in the compulsory education of Maine children. Without a doubt the closing of a "pervasively sectarian" school would burden the First Amendment rights of more individuals (those teaching and preaching at, and those supporting and attending, the institution) in a more direct and substantial manner than truancy actions against the parents or guardians of the "habitual truants" whose education the state seeks to promote.[48] Therefore, the requested injunctive relief raises far more problematic constitutional questions than those brought into play by the truancy-prosecution scheme prescribed by the legislature.

And from a purely practical perspective as well injunctive relief would impose substantially greater burdens on *all* of the plaintiffs, the *churches, schools, parents and staff,* than would enforcement under the legislative scheme. The requested injunctive relief (apparently) would prohibit the *operation* of an unapproved church school during public school hours *if a single compulsory-school-age child were in attendance,* in derogation of the religious liberties of the nonschool-age students and despite the fact that the school-age child might be otherwise exempt from the requirement of compulsory attendance at a public school. For example, the local school board may excuse compliance with the compulsory education laws for students 14 years of age or older. 20–A M.R.S.A. §§ 5002(1)(A), 5051(2)(D)(2). Alternatively, a compulsory-school-age child attending an unapproved church school may have obtained an exemption by establishing that the school (which may be unapproved solely because it refused to seek approval) provides "equivalent instruction," or by establishing that the child receives "equivalent instruction" "in any other manner" for which the approval of the Commissioner has been obtained. 20–A M.R.S.A. § 5001(2)(D).[49]

**46.** Of course, the defendants *do* have the *right to request* the courts to close unapproved schools, both by virtue of their "standing" in the present action and by virtue of a Board regulation, *see* 05–071 CMR 125, section 1–A, subsection I(4) (as amended Feb. 10, 1983). Thus viewed, however, their assertion of right is without that legislative sanction which would reduce the heavy burden of proof incumbent upon any private litigant seeking similar drastic relief in the face of severe equitable and constitutional obstacles.

**47.** In order to be considered "pervasively sectarian" a school must not only be run directly by a church, but have "attributes such as integration of secular and religious education, mandatory religious instruction, religious based admission policies [and have] as a central purpose the inculcation of religious values [or the preparation of] students for a religious career." *Cuesnongle v. Ramos,* 713 F.2d 881, 883 (1st Cir. 1983).

**48.** A burden on the free exercise of religion may be justified only "by showing that it is the least restrictive means of achieving some compelling state interest," *Thomas v. Review Board of Indiana Employment Security Division,* 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981). Although it is unnecessary to decide on the present record (there being no authority for defendants' attempt to close the church-schools), the closing of pervasively religious institutions does not appear to be "the least restrictive means" of achieving the state's interest in assuring that children between 7 and 17 attend adequate schools for a minimum number of hours during 175 days per year or obtain equivalent instruction in some other manner. While administrative convenience has at times justified some burdens on religious exercise, *see United States v. Lee,* 455 U.S. 252, 259–61, 102 S.Ct. 1051, 1056–57, 71 L.Ed.2d 127 (1982) [inconvenience of accommodating "the comprehensive social security system with myriad exceptions flowing from a wide variety of religious beliefs"], it is highly unlikely that the administrative burden of pursuing numerous prosecutions under an existing truancy system could be considered sufficient justification for directly burdening these plaintiffs, particularly since it is not unreasonable to expect that the general deterrent effect likely to flow from the initiation of exemplary prosecutions against a few truancy law violators may well promote improved compliance with the compulsory school attendance laws.

**49.** Of course, injunctive relief would have to be limited so as to reflect these possibilities. *See Lynch v. Dukakis,* 719 F.2d 504 at 513 (1st Cir.

### The Public Interest

The Maine legislature perceives the public interest as requiring that truancy-law enforcement be commenced at the local level by local officials who are directed to consider and address the needs of the individual student, whereas the requested injunctive relief would relegate the individual student to the background of the constitutional controversy between church and state.

■ It does not appear that the plaintiff church schools have acted unlawfully;[50] if they have acted unlawfully, it does not appear that defendants' remedy at law is inadequate; and injunctive relief would pose a severe risk of burdening protected First Amendment rights. Accordingly, injunctive relief against the church schools is not warranted.

### D. Dismissal of Counterclaim

■ There being no relevant legislative prohibition and no legislative delegation of the power to prohibit the operation of private schools, the defendants are no more entitled to the requested *declaratory* relief than to injunctive relief. There being no obligation to seek approval, the plaintiff church schools are not required to provide the information necessary to obtain approval. Whether unapproved schools may be required to furnish to the state the names, addresses and attendance records of their students is not before the Court, since it does not appear that there has been any attempt to impose such a requirement.[51]

Except for possible prosecution under the truancy laws, nonapproval is the only direct consequence of the failure or refusal of the plaintiff church schools to provide the school approval information demanded by the Department.

The counterclaim is therefore DISMISSED.

### III. COMPLAINT

There being no legislative license to close unapproved private schools, the Court must next determine whether the *complaint* presents a "case or controversy."

Article III, section 2, of the United States Constitution restricts the exercise of the

---

1983). But drafting such an injunction would be a cumbersome and perilously difficult undertaking. Certainly the defendants' proposal is overbroad. More importantly, injunctive relief would burden the plaintiff church schools with the task of determining which students are (and perhaps which students may be) exempt from the compulsory attendance requirement. Finally, since the essence of their free exercise claim is that plaintiffs should not be made to answer to the state for their (*"biblically-mandated"*) educational activities, any requirement that the plaintiff schools assume an active role in the enforcement of the truancy laws against the parishioners of their affiliated churches would heighten significantly the threatened intrusion upon plaintiffs' asserted religious convictions.

**50.** The Maine compulsory education scheme differs importantly from that considered in *State ex rel. Douglas v. Faith Baptist Church,* 207 Neb. 802, 301 N.W.2d 571 (1981), *appeal dismissed sub nom. Faith Baptist Church v. Douglas,* 454 U.S. 803, 102 S.Ct. 75, 70 L.Ed.2d 72 (1981), where the Nebraska Supreme Court upheld a judgment enjoining the *operation* of a church school for refusal to comply with *statutory* requirements imposed upon "[a]ll private, denominational, and parochial schools in the State of Nebraska...," Neb.Rev.Stat. § 79–1701. The Nebraska statutes governing private schools pro-

vide that "[a]ny person violating any of the provisions of [Article 17, governing private, denominational and parochial schools] shall be guilty of a Class III misdemeanor." The Nebraska Supreme Court held that injunctive relief was not foreclosed merely because state law prescribed penal sanctions. 301 N.W.2d at 575. The United States Supreme Court summarily dismissed the appeal. 454 U.S. 803, 102 S.Ct. 75, 70 L.Ed.2d 72. The essential distinction here is that Maine law neither requires private schools to obtain approval as a condition precedent to their *right to operate* nor does it imply any sanction (except possible prosecution for inducing habitual truancy) for *operating* as an unapproved school.

**51.** Private schools which seek approval are required to disclose their "policy with respect to" attendance records. Regulations under the heading "Procedures and Standards for Basic School Approval of Private Schools" provide that "[t]he school shall maintain a register of the daily attendance of all pupils throughout the school year ... [and] notify the superintendent of [local] schools ... if a pupil withdraws from school or is habitually truant from school." 05–071 CMR 125, section I–A, subsection (F)(1)(3), *as amended* February 10, 1983. The regulations apparently impose no such requirement on schools which do not seek approval.

judicial power of the United States to "[c]ases ... [and] [c]ontroversies." U.S. Const. art. III, § 2, cl. 1.

### A. Ripeness of Claim for Relief Enjoining Truancy Actions Against Parents [52]

The doctrine of "ripeness" has undergone significant transformation from the days when the term "advisory opinion" was afforded a sweeping definition. *See International Longshoremen's and Warehousemen's Union v. Boyd*, 347 U.S. 222, 74 S.Ct. 447, 98 L.Ed. 650 (1954). Since the watershed decision in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), ripeness jurisprudence has assumed a decidedly practical bent.[53] Absent congressional action curtailing jurisdiction, "[t]he problem [of the ripeness of a challenge to a statute, regulation or rule] is best seen in a twofold aspect, requiring ... evalua[tion of] both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515.

### Fitness of Issues for Judicial Decision

The existence of a sufficiently developed factual record is essential to any determination that problematic constitutional issues are ripe for judicial review. *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 301, 304, 99 S.Ct. 2301, 2310, 2311, 60 L.Ed.2d 895 (1979); *Abbott Laboratories v. Gardner*, 387 U.S. at 149, 87 S.Ct. at 1515; *American Committee for Protection of Foreign Born v. Subversive Activities Control Board*, 380 U.S. 503, 505, 85 S.Ct. 1148, 1149, 14 L.Ed.2d 39 (1965) [*per curiam*]. Due to the fact-specific nature of the constitutional claim asserted by the parent-plaintiffs, *Bangor Baptist Church v. State of Maine*, 549 F.Supp. at 1216–20, their claim cannot be considered ripe without a fully developed record, *cf. Abbott Laboratories v. Gardner*, 387 U.S. at 149, 87 S.Ct. at 1515 [sparse factual record no obstacle to ripeness where "issue tendered is a purely legal one"]. Although the parties have labored to develop the record, most of their efforts have focused upon whether the state's interest in either "licensing" or closing the various plaintiff church schools overrides the plaintiffs' religion-based interest in insulating their church schools from the state approval requirement. Much of that evidence is rendered valueless since Maine law simply establishes a private-school *approval scheme* for the purpose of determining the eligibility of private school students to an *exemption from the public-school compulsory attendance requirement.* What remains to be decided under the parent-plaintiffs' request that the defendants be enjoined from prosecuting parents under the truancy laws is whether the compulsory education law, de-

---

**52.** The *second Second Amended Complaint* prays for a declaration that the requirements of the compulsory education law and school approval scheme are contrary to the First, Ninth and Fourteenth Amendments to the Constitution, and for relief enjoining "defendants ... from taking *any action* in an attempt to impose upon plaintiffs [those requirements]." [*Emphasis added.*] It has been clear throughout that plaintiffs' primary concern is with the state's alleged right to license or close unapproved schools. That concern is answered by the Court's holding that Maine law establishes only an optional approval system, not a licensing scheme. Therefore, in determining whether the complaint raises any justiciable issues the Court must consider seriatim the other "actions" which defendants conceivably could take "in an attempt to impose upon the plaintiffs [the requirements of the compulsory education law and the school approval scheme].

Title 20–A M.R.S.A. section 13003(2) provides that a person teaching at a *public* school without a teacher's certificate "shall be barred from receiving pay or wages for that teaching." No penalty is prescribed for teaching at a *private* school without a certificate.

Plaintiff teachers have not even alleged, much less "demonstrate[d,] a realistic danger of sustaining a direct injury as a result of the ... enforcement," *Babbitt v. United Farm Workers National Union*, 442 U.S. 289 at 298, 99 S.Ct. 2301 at 2308, 60 L.Ed.2d 895 of any statutory or regulatory provision other than those directed against the *church-schools. See* n. 55 *infra.*

**53.** For a discussion of the development of the law of ripeness, *see* 4 K. Davis, *Administrative Law Treatise* 349–93 (2d ed. 1983).

spite its flexibility and myriad exceptions, impermissibly burdens the exercise of the religious beliefs of the plaintiff-*parents*.[54] The present record relevant to these issues is extraordinarily sparse.

The very existence of this flexible, in some respects fairly new, and largely untested, statutory scheme, itself militates against judicial review. Although the Board's present approach to the implementation of the statutory scheme implicates serious First Amendment concerns, those constitutional concerns are mooted by the Court's ruling that the Board's present approach is invalid under the statutory scheme. *See* p. 1221 *supra.* Presumably, new Board regulations implementing a different approach will follow. How the new Board regulations may comport with the statutory scheme and affect plaintiffs' constitutional rights are questions which time, not speculation, can best answer. *See California Bankers Association v. Shultz,* 416 U.S. 21, 55–56, 94 S.Ct. 1494, 1514–1515, 39 L.Ed.2d 812 (1974) [challenge to statutory record-keeping requirement, on grounds that it "could possibly be used to obtain" protected information, held nonjusticiable].

### Hardship To The Parties

Affecting both the fitness of the challenge for judicial review and the hardship to the parties in the absence of judicial review, the *likelihood of enforcement* is central to the ripeness of an *anticipatory challenge* to a statute prohibiting conduct arguably entitled to constitutional protection.

A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement. *O'Shea v. Littleton,* 414 U.S. 488, 494 [94 S.Ct. 669, 675, 38 L.Ed.2d 674] (1974). But '[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough.' *Pennsylvania v. West Virginia,* 262 U.S. 553, 593 [43 S.Ct. 658, 663, 67 L.Ed. 1117] (1923); see *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 143 [95 S.Ct. 335, 358, 42 L.Ed.2d 320] (1974); *Pierce v. Society of Sisters,* 268 U.S. 510, 526 [45 S.Ct. 571, 574, 69 L.Ed. 1070] (1925).

When contesting the constitutionality of a criminal statute, 'it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights.' *Steffel v. Thompson,* 415 U.S. 452, 459 [94 S.Ct. 1209, 1216, 39 L.Ed.2d 505] (1974); see *Epperson v. Arkansas,* 393 U.S. 97 [89 S.Ct. 266, 21 L.Ed.2d 228] (1968); *Evers v. Dwyer,* [358 U.S. 202, 79 S.Ct. 178, 3 L.Ed.2d 222] at 204 [79 S.Ct. at 179]. When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.' *Doe v. Bolton,* 410 U.S. 179, 188 [93 S.Ct. 739, 745, 35 L.Ed.2d 201] (1973). But 'persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs.' *Younger v. Harris,* 401 U.S. 37, 42 [91 S.Ct. 746, 749, 27 L.Ed.2d 669] (1971); *Golden v. Zwickler,* 394 U.S. 103 [89 S.Ct. 956, 22 L.Ed.2d 113] (1969). When plaintiffs 'do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible,' they do not allege a dispute susceptible to resolution by a federal court. *Younger v. Harris,* [401 U.S.] at 42 [91 S.Ct. at 749].

---

**54.** The justiciability of plaintiffs' request to enjoin actions against schools and pastors for inducing habitual truancy is considered below. *See* pp. 1333–1335 *infra.*

*Babbitt v. United Farm Workers National Union*, 442 U.S. at 298–99, 99 S.Ct. at 2308–09 (1979).[55]

The First Circuit recently found no "case or controversy" where a juvenile brought a First and Fourteenth Amendment facial challenge against a city curfew ordinance directed against persons under age 16. *McCollester v. City of Keene*, 668 F.2d 617, 621–22 (1st Cir.1982). The court considered the action *unripe* because the juvenile plaintiff failed to allege the conduct in which she intended to engage and because the challenged ordinance was susceptible to an interpretation by local officials which would limit its reach to after-curfew conduct posing a risk of injury or disturbance to others. *Id.* at 620–21. The First Circuit said that "there is no case or controversy unless the plaintiff is subject to something more than a speculative risk of prosecution." *Id.* at 621.

> There must be 'a credible threat of prosecution' of the plaintiff personally, *Babbitt, supra,* which means, in the words of Justice Brennan—a justice whose opinion in *Steffel* shows him sympathetic to a broad construction of Article III in connection with complaints seeking a federal court declaratory judgment with respect to the constitutionality of state statutes—a 'likelihood that a prosecution will actually ensue.' *Regional Rail Reorganization Act Cases, supra.*

*Id.* at 621. *See also City of Los Angeles v. Lyons,* — U.S. ——, ———– ——, 103 S.Ct. 1660, 1664–68, 75 L.Ed.2d 675 (1983); *Munoz-Mendoza v. Pierce,* 711 F.2d 421, 426–30 (1st Cir.1983); *High Ol' Times, Inc. v. Busbee,* 621 F.2d 135, 139 (5th Cir.1980) [plaintiff must demonstrate "a genuine threat of imminent prosecution"]; *Bickham v. Lashof,* 620 F.2d 1238, 1247 (7th Cir.1980) ["case or controversy" requirement satisfied by showing that state intended to prosecute act plaintiff expressed intention to commit]; *St. Martins' Press, Inc. v. Carey,* 605 F.2d 41, 44–45 (2d Cir. 1979) [no "case or controversy" in challenge to child pornography statute where prosecutors declared that they would not enforce statute in regard to the book which was the object of plaintiff's complaint]; *Rincon Band of Mission Indians v. County of San Diego,* 495 F.2d 1, 4–6 (9th Cir.), [absent some relevant history of prosecution, statements made by deputy sheriffs to Indians, that gambling ordinance was applicable to all in the county, and by the sheriff, that all laws would be enforced, were insufficient threats of prosecution to give rise to "case or controversy" in challenge to enforcement of ordinances on Indian reservations], *cert. denied,* 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974). *See generally* Comment, *Threat of Enforcement— Prerequisite to a Justiciable Controversy,* 62 Colum.L.Rev. 106 (1962).

There is no threat by any state or local official to enforce *the truancy laws* against any of these plaintiff parents. The record reveals that defendants expressly disavow any intention to institute, encourage or permit truancy actions against the parents of church-school students. *See Babbitt v. United Farm Workers National Union,* 442 U.S. at 302, 99 S.Ct. at 2310. The Commissioner testified that, if it were held that truancy actions against the parents of children attending unapproved church-schools offered the only means of enforcing the school approval laws and regulations, he would "act through the courts" rather than institute truancy actions, Tr. at 1085, 1139, and that before he could pursue truancy actions against parents he would first have to obtain legislative authorization for additional funding and staff, *id.* at

---

**55.** On occasion the Supreme Court has found the likelihood of enforcement of a challenged statute too remote to give rise to a "case or controversy." *See Poe v. Ullman,* 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) [challenge to legislation prohibiting use of, or giving medical advice as to, contraceptive devices was nonjusticiable, because no one had been prosecuted since its enactment in 1879 despite open and notorious sales of contraceptives]; *United Public Workers v. Mitchell,* 330 U.S. 75, 88–89, 67 S.Ct. 556, 563–564, 91 L.Ed. 754 (1947) [action by federal employees challenging constitutionality of Hatch Act prohibition of political activity was non-justiciable, since plaintiffs merely alleged their desire to engage in politics and their fear of dismissal, but failed to allege an actual violation or an actual threat of disciplinary action].

1144.[56] Enforcement of the truancy laws against the parents of children attending unapproved church-schools was characterized by the Commissioner as a "misuse" of the truancy laws, and "inappropriate, if not harmful," Tr. at 1139–41. The trial testimony was corroborative of an earlier affidavit in which the Commissioner stated that he had "discouraged" local officials from undertaking truancy enforcement against the parents of the students of these unapproved church schools.[57] Second Supplementary Affidavit of Commissioner Raynolds, ¶ 13 (filed April 20, 1982). On October 14, 1980 the Commissioner instructed school superintendents that, "[u]ntil [they] hear from ... [the Commissioner's] office, [they] should not take any legal steps to enforce the truancy laws against students attending these unapproved schools." Defendants' Exhibit 36.

These representations by the Commissioner, together with the position consistently taken throughout these proceedings by the defendants, through their counsel, see, e.g., Defendants' Post-Trial Brief, at 59 ["truancy actions are an inappropriate, ineffective and unacceptable ... way of dealing with the issues in this case"], demonstrate that the defendants do not contemplate, even if they are empowered to pursue or "direct,"[58] truancy prosecutions against the parents of children attending unapproved church-schools was characterized

against the parents of children attending the plaintiff church schools.

Furthermore, the record is devoid of evidence that a truancy proceeding has ever been commenced, even to this day, against a parent or guardian of any child attending any unapproved private school, much less one of the unapproved plaintiff church schools. Moreover, there is no evidence that there has ever been a threat, by local public school officials or by any of the defendants, to bring, encourage or permit any such truancy action. Instead, the record reveals: (1) repeated disavowals by the Commissioner of any intention to proceed with truancy actions against either students or parents; (2) instructions by the Commissioner to all public school superintendents to refrain from truancy actions against those students and parents "until [the Superintendents] hear from ... [the Commissioner's] office;" (3) uniform compliance by local public school officials with the instructions of the Commissioner; (4) uncontradicted evidence that, before resorting to truancy actions against the parents of students attending these unapproved schools, the Commissioner would first have to obtain *legislative* authorization for additional staff and funding; and (5) no intimation whatever that any of the defendants would resort to truancy actions to enforce the compulsory education laws once it had been finally determined by the courts that

---

**56.** This testimony reflects the Commissioner's consistent misconception as to the legislative placement of primary responsibility for the enforcement of the truancy laws. It is clear beyond doubt from the statutes that the Maine legislature has imposed that responsibility primarily upon *local* public school officials. *See* 20–A M.R.S.A. §§ 5051, 5052 & 5053. *See* nn. 57 & 58 *infra*.

**57.** Subchapter I of Chapter 211 of Title 20–A, M.R.S.A., dealing with compulsory attendance (§ 5001), alternate programs (§ 5002) and administration (§ 5003), expressly provides that the *local* public school boards "shall administer" subchapter I, *see* § 5003(1), and adopt rules "to carry out this subchapter," *see* § 5003(2). Subsection (3) of section 5003 provides that "[t]he Commissioner shall guide school boards in adopting these rules." 20–A M.R.S.A. § 5003(3).

**58.** Section 254 provides:

The Commissioner shall have the following duties.

1. *General duty.* The commissioner may inspect and have general supervision over all public schools and shall advise and direct superintendents and school boards in the discharge of their duties, by circular letters and personal conferences.

20–A M.R.S.A. § 254.

The Court need not decide whether section 254 empowers the Commissioner to "direct superintendents and school boards" to *refrain* from "the discharge of their duties," as well as "direct" those officials "in the discharge of their duties." If the Commissioner does not have the authority to direct superintendents and school boards to refrain from truancy actions, those officials who might pose more than a speculative risk of prosecution to the plaintiffs (i.e., local superintendents and school boards) are not before the Court.

direct action to close unapproved private schools is *ultra vires.*

Finally, the complaint does not allege and the record does not indicate that any potential truancy-action prosecution against the plaintiff parents has chilled the exercise of their First Amendment rights or affected the actions of those parents or any other plaintiff. *See Doe v. Bolton,* 410 U.S. at 188–89, 93 S.Ct. at 745–46 [challenge to Connecticut abortion statute justiciable since doctors alleged that the statute "chilled and deterred" practice of their profession].

Since the defendants deny any intention to institute truancy actions against the parents of students attending these unapproved church schools, neither plaintiffs nor defendants can point to any relevant hardship resulting from the Court's refusal to enjoin.

### B. *Claim for Relief Enjoining Actions Against Schools for Inducing Truancy by Mere Operation*

In dismissing defendants' counterclaim, the Court has held that mere operation of an unapproved private school does not violate the prohibition against inducing habitual truancy. *See* pp. 1321, 1328 *supra.* Accordingly, and in view of the judicial obligation to avoid serious constitutional issues when other grounds are available, p. 1323 *supra,* the Court does not reach the issue as to whether a statute authorizing such an action would violate the constitutional rights of the plaintiffs. Moreover, the Court is satisfied that enjoining the defendants from instituting such actions under the current statute would be inappropriate.[59] "[T]here is no evidence before [the Court] that would indicate that defendants will not accept in good faith" the Court's holding as to the meaning of the word "induce." *Wulp v. Corcoran,* 454 F.2d 826, 835 (1st Cir.1972).

### C. *The Claim for Relief Enjoining Actions Against Pastors*

#### *Ripeness*

The only other credible prospect of truancy prosecution which might be considered sufficient to present a "case or controversy" under the complaint in this action results from the absence of any express disavowal of an intention to commence actions against the plaintiff pastors for inducing habitual truancy in violation of 20–A M.R.S.A. § 5053(1)(B). *See Babbitt v. United Farm Workers National Union,* 442 U.S. at 302, 99 S.Ct. at 2310. Although the Commissioner did not actually threaten any such prosecution of the pastors in the letters which precipitated the present action, the language of those letters, *see* Defendants' Exhibits 46a–i [Attorney General will "commence legal action"], is broad enough to encompass an action under the "inducing" statute, and, as of February 16, 1983, defendants' attorneys considered the statute applicable to the conduct of at least some of the plaintiffs. *See* Defendants' Memorandum Regarding Ultra Vires Issue, at 10–11. Moreover, actions against the plaintiff pastors would fit neatly into the strongly held view of the Commissioner, *see* pp. 1331–1332 *supra,* and defense counsel, *see* p. 1332 *supra,* that enforcement of the compulsory education laws should be directed at the plaintiff schools, rather than at their students or the parents of their students. Indeed, defendants' threatening assertion, that "the plaintiffs ... induce their students to attend their unapproved schools," [Defendants' Memorandum Regarding Ultra Vires Issue, at 10], appears to refer to the religious edification of parishioners by the plaintiff pastors. The record is adequately developed as to the nature and basis of this religious instruction. There can be little doubt that in every sense of the word pastors do "induce" parishioners to send their children to church-affiliated schools and that the threatened enforcement actions raise serious constitutional questions.

Accordingly, the claim for injunctive relief protecting the right of the pastors to preach the Gospel is ripe.

#### *Merits*

Prosecution of the pastors or the administrators of church schools for inducing

---

**59.** No declaratory relief is granted on this point because none is requested.

truancy, whether in sermons or in other communications with students or parents in the congregation, would raise fundamental free speech and free exercise concerns.[60]

■ In 1945 the Supreme Court observed that in establishing the boundary "where the individual's freedom ends and the State's power begins ... the usual presumption supporting legislation is balanced by the preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment." *Thomas v. Collins*, 323 U.S. 516, 529–30, 65 S.Ct. 315, 322, 89 L.Ed. 430 (1945). When First Amendment rights are implicated,

> [t]he rational connection between the remedy provided and the evil to be curbed, which in other contexts might support legislation against attack on due process grounds, will not suffice. These rights rest on firmer foundation. Accordingly, whatever occasion would restrain orderly discussion and persuasion, at appropriate time and place, must have clear support in public danger, actual or impending. Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation. It is therefore in our tradition to allow the widest room for discussion, the narrowest range for its restriction, particularly when this right is exercised in conjunction with peaceful assembly.

*Id.* at 530, 65 S.Ct. at 322. "For these reasons any attempt to restrict those liberties must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger." *Id. See also id.*, at 532, 65 S.Ct. at 323 (intrusion permitted "only if grave and impending public danger requires" it). "The substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished." *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 845, 98 S.Ct. 1535, 1544, 56 L.Ed.2d 1 (1978). Government authorities may not "forbid or proscribe advocacy of the use of force or law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969) (footnote omitted) [*per curiam* ]. *See also Hess v. Indiana*, 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973) [disorderly conduct statute unconstitutionally applied to antiwar protester since there could be no rational inference "that his words were intended to produce, and likely to produce *imminent* disorder"]. Courts must balance the magnitude and imminence of the danger posed by the speech, against "the need for free and unfettered expression," as well as the "possibility that other measures will serve the State's interests." *Landmark Communications, Inc. v. Virginia*, 435 U.S. at 843, 98 S.Ct. at 1543. *See also State v. John W.*, 418 A.2d 1097, 1102 (Me.1980) [constitutionality of disorderly conduct conviction must be tested by balancing magnitude and character of evil, as well as its likelihood, against need for free and unfettered expression].

■ Any action brought against plaintiff pastors, administrators or church schools for inducing truancy by "preaching" that the Bible commands fundamentalist Christians to send their children to schools regulated solely by fundamentalist Christians would certainly "restrain orderly discussion and persuasion," *Thomas v. Collins*, 323 U.S. at 530, 65 S.Ct. at 322. Such a restraint would also hinder the right of assembly and the free exercise of religion. Defendants have not suggested any "grave[ ] abuses, endangering paramount interests," *id.*, which would justify the threatened restraints. Clearly, there are other, less problematic measures, i.e., en-

---

**60.** The principles applicable to speech in general are clearly applicable as well to religious speech. "[S]peech *about* religion is speech entitled to the general protections of the First Amendment." *Widmar v. Vincent*, 454 U.S. 263, 269 n. 6, 102 S.Ct. 269, 274 n. 6, 70 L.Ed.2d 440 (1981). *See also Heffron v. International Society for Krisna Consciousness, Inc.*, 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981).

forcement of the truancy laws, which would serve the state interests involved.

Plaintiffs therefore are entitled to declaratory and injunctive relief [61] precluding defendants from bringing actions against them on the grounds that they induce truancy through their statements to parents that the education of their children is a religious duty and that the state should have no role in regulating the education of Christian children.

## ORDER FOR ENTRY OF JUDGMENT

In accordance with the Court's 'Findings of Fact and Conclusions of Law', entered this date, judgment shall enter: (1) for the defendants against the plaintiffs on plaintiffs' claims for declaratory and injunctive relief, except as otherwise provided in clauses (3) and (4) hereof; and (2) dismissing plaintiffs' claims, except as otherwise provided in clauses (3) and (4) hereof; (3) for the plaintiffs as against the defendants on plaintiffs' claim for a judicial declaration that the bringing of actions against the plaintiff pastors, administrators or church schools on the ground that they have induced habitual truancy through their statements to parents that the education of their children is a religious duty and that the state should have no role in regulating the education of Christian children would violate the rights secured to the plaintiffs by the First and Fourteenth Amendments of the United States Constitution; (4) for the plaintiffs against the defendants on plaintiffs' claim for injunctive relief *ENJOINING* the defendants from bringing actions against the plaintiff pastors, administrators or schools on the ground that they have induced habitual truancy through their statements to parents that the education of their children is a religious duty and that the state should have no role in regulating the education of Christian children;

(5) for the plaintiffs as against the defendants on defendants' counterclaim; and (6) dismissing the counterclaim.

SO ORDERED.

---

**61.** The right of these pastors to preach their interpretation of the Bible is clear. The requested injunction would ensure the preservation of that right and protect the pastors (and the public) from the expense of presenting (and resolving) this same constitutional claim as a defense to a state court action for "inducing" habitual truancy. On the other hand, injunctive relief will impose no burden on the defendants, who remain free to pursue legislatively-prescribed means for the protection of the interests of the state. Accordingly, injunctive relief is appropriate under the standards relevant to this federal claim, *see* n. 22 *supra.*